STATE OF NORTH CAROLINA v. WILLIAM THOMAS RIDDICK

No. 113A85

(Filed 18 February 1986)

1. Criminal Law § 87.1— children as witnesses—leading questions proper

The trial court in a murder and arson case did not err in allowing the prosecutor to ask leading questions of an 11-year-old and a 15-year-old who were in the house when it was burned where the witnesses had trouble in understanding certain questions asked of them. N.C.G.S. 8C-1, Rule 611(a) and (c).

2. Criminal Law § 33.2— admissibility of defendant's statements—personal knowledge of witness

In a prosecution for murder, arson and assault there was no merit to defendant's contention that a witness who was in the house at the time of the

State v. Riddick

fire could not properly testify as to statements allegedly made by defendant, since the witness's testimony that she in fact heard defendant make the statements in question *ipso facto* amounted to testimony that she had the ability to hear him make those statements; no more was required to establish her personal knowledge of the matter pursuant to N.C.G.S. 8C-1, Rule 602; and the witness's testimony also established that she was near defendant when she heard him make the statements.

**3. Arson § 3— kerosene odor in house—questions assuming facts not in evidence —no prejudice**

Even if the trial court in an arson case erred in allowing two witnesses to answer questions as to what they could smell while in the house because the questions assumed facts not yet in evidence, such error was not prejudicial since the record was replete with evidence that kerosene was in the house at all times in question and had been used by defendant to start a fire in a wood heater so that there would have been nothing remarkable about an odor of kerosene in the house.

**4. Arson § 3— arson victim—evidence of defendant's physical mistreatment— admissibility to show motive**

In a prosecution of defendant for arson of a house he shared with a woman and her four children, evidence that defendant physically mistreated the woman when she returned home after spending time elsewhere was admissible as it tended to show the defendant's motives and state of mind at the time the crimes occurred, though motive was not an element of the crimes for which defendant was on trial, since motives and state of mind at the time of the fire certainly were facts of consequence to the determination of the action. N.C.G.S. 8C-1, Rule 401.

**5. Criminal Law § 51— qualification of expert—necessity for specific objection**

Defendant could not complain that testimony of an eleven-year veteran of the city fire department opining that a flammable liquid was burning on the living room floor and "trailing" towards the kitchen was inadmissible because the fireman was never qualified as an expert witness, since defendant merely made a general objection to the testimony and did not object specifically to the witness's qualifications as an expert.

**6. Assault and Battery § 5.2— burning of occupied house—fire as deadly weapon**

In a prosecution for assault with a deadly weapon with intent to kill inflicting serious injury, evidence tending to show that the victim of the assault was five years old and asleep at the time defendant set fire to the house was sufficient to justify the trial court in permitting the jury to find that the fire in the present case was used as a deadly weapon.

**7. Arson § 4.1; Assault and Battery § 14.1; Homicide § 21.5— arson—first degree murder—assault with deadly weapon—sufficiency of evidence**

In a prosecution for first degree murder, first degree arson, and assault with a deadly weapon inflicting serious injury, evidence was sufficient to be submitted to the jury where it tended to show that defendant lived in a house with a woman and her four children; defendant thought the woman had been

staying with other men at times when she absented herself from him; he had beaten her on more than one occasion for this reason, most recently a day or two before the fire; he had also treated her children in a "mean" fashion; on the night of the fire defendant bought kerosene in a five-gallon can and took it home with him; excluding defendant, all the occupants of the home went to sleep; sometime thereafter, the occupants who survived were awakened by a large fire which was burning in the living room and "trailing backwards" to the kitchen; defendant was the only person awake in the house at the time the fire broke out; expert testimony tended to show that the "pour pattern" established that from 2½ to 5 gallons of flammable liquid had burned on the living room and kitchen floors; defendant was the only person in the house to use a flammable liquid on the night of the fire; and defendant was smiling when he stated a short time after the fire, "That was a lot of money riding on this fire," and "I messed up."

APPEAL by the defendant from judgments entered on 4 October 1984 by *Small, J.*, in Superior Court, PASQUOTANK County.

The defendant was convicted upon proper indictments for first degree murder, first degree arson, and assault with a deadly weapon inflicting serious injury. He was sentenced to separate terms of life imprisonment for murder and arson and to imprisonment for ten years for the assault. All three prison terms were ordered to run consecutively.

The defendant appealed the murder and arson convictions and resulting life sentences to the Supreme Court as a matter of right. His motion to bypass the Court of Appeals on his appeal of the assault conviction was allowed by the Supreme Court on 15 March 1985. Heard in the Supreme Court 17 October 1985.

*Lacy H. Thornburg, Attorney General, by Reginald L. Watkins, Special Deputy Attorney General, for the State.*

*William T. Davis for the defendant-appellant.*

MITCHELL, Justice.

By his assignments, the defendant contends that the trial court made several errors. He contends the trial court erred by allowing witnesses to respond to leading questions, to questions for which a proper foundation had not been laid, and to a question that assumed facts not yet in evidence. The defendant also contends the trial court erred by admitting irrelevant testimony and by allowing a witness not qualified as an expert to give opinion

testimony. Finally, he contends that the trial court erred by denying his motions to dismiss the charges against him. We find no error.

The State's evidence tended to show that on the night of 12 January 1984, the Elizabeth City Fire Department responded to an alarm for a fire at 208 Oak Grove Avenue. The house which burned was the dwelling place of Ruth Cowell and her four children: Don Earl Davis, Michele Cowell, Latoyia Cowell and Lateyia Cowell. The defendant, William Thomas Riddick, was living with them at the time of the fire. Lateyia Cowell was killed as a result of the fire, and Latoyia and Don were burned.

Around 10:00 p.m. on 12 January 1984, Marie Brooks looked out of her window and across the street and saw smoke coming from 208 Oak Grove. She told her daughter to call the fire department. Her daughter called the fire department and reported the fire. By that time Ruth Cowell's house at 208 Oak Grove was "in blazes."

Michele Cowell, eleven years old, testified that she lived at 208 Oak Grove with her mother Ruth Cowell, the defendant William Riddick, and her three siblings. Approximately four days before the fire, Vernon Brooks, Ruth's friend and Lateyia's father, picked up Ruth and the children. They stayed at various places and went to Godley Temple's house on the day of the fire. Ruth sent Michele to the defendant's shop to ask him to send her food stamps and a television. The defendant told Michele that Ruth would have to come and get them. The defendant later came to Godley Temple's house. Upon his assurances that he would not beat Ruth anymore, Ruth told her daughters to get into the defendant's car. The defendant took the girls to his shop where they were later joined by Ruth and Don.

At nightfall Ruth and her four children left the shop and went to 208 Oak Grove with the defendant. It was cold in the house, so the defendant lit a fire in the wood heater located in the living room by putting wood, paper, and kerosene in the heater. He got the kerosene from a can located on the back porch and returned the can to the porch. Michele testified that this was the first time that she had seen the defendant put kerosene in the wood heater. No other heater was lit in the house that night.

Michele got a quilt, and she and Lateyia covered up on a chair located about one foot from the heater and fell asleep. Ruth and Latoyia went to sleep on a couch in the bedroom. The defendant was in the kitchen.

Michele testified that she was awakened when she felt something warm on her back. She turned and saw fire in the kitchen and going into the dining room. The room she was in was also on fire with fire coming from the wood heater and spreading. Michele smelled a strong odor of kerosene. She felt for Lateyia but could not find her. She moved a table that was in her way and went out the front door. She then heard Lateyia and Latoyia crying in the house.

Michele went to the house of a neighbor, Mr. Lamb, and then to the house of Miss Spellman, another neighbor. While at Miss Spellman's she heard the defendant say: "Umm that house caught on fire like that." He also said: "That was a lot of money riding on this fire." and "I messed up." *The defendant was smiling* when he came to Miss Spellman's from the fire.

Michele testified that the defendant treated Lateyia "kind of mean." He forced a hotdog down her throat once because she ate slowly. He would make her stand on one leg on a chair if she did something wrong, and if she put the other leg down he "would beat her." Michele also testified that she had seen the defendant throw Lateyia down and "[t]ake her by the back of the neck and pick her up."

Ruth Davis Cowell testified that she and her children left the house at 208 Oak Grove for four days because she and the defendant had been arguing. While they were running errands before returning home on the night of the fire, the defendant purchased kerosene which he put in a five gallon can and placed in the back of the truck. After the defendant started the fire in the wood heater, he carried a kerosene heater into the bedroom. Ruth then fell asleep. She was awakened by the defendant who pulled her and said: "Get out. The house is on fire." He pulled her from the house. Then he ran around the house calling Don and breaking out windows. When Ruth was awakened she detected a strong odor of kerosene.

Ruth testified that she had a $5,000 life insurance policy on each of her four children. She is the beneficiary of each policy and

received payment under the policy on Lateyia. She had attempted to make the defendant a beneficiary but was unsuccessful because he was not a relative.

Ruth's son Don testified that when he came home the night of the fire, he went to the kitchen and warmed food for everyone. He ate some cake, and went to the back bedroom where he fell asleep. Next, he heard the defendant calling him, so he went to the back door but could not get it open. When Don first came out of the bedroom he "smelled something like gas . . . ." The house was full of smoke and fire. He finally got the back door open and escaped. His ears and nose were burned. Don also testified that this was the first time he had seen the defendant use kerosene to light the wood heater. He corroborated Michele's accounts of the defendant's treatment of Lateyia.

Louise A. Spellman lived next door to 208 Oak Grove Avenue. The defendant came to her house the day following the fire. Her testimony concerning the conversation she had with the defendant on that occasion included the following:

Q. And did you—what, if anything, did he—did he say about money?

. . . .

A. Well, we were talking about the children and he said to me "There is a lot of money riding on those children." So I said, "How do you know?" He said "I ought to know. I helped pay it sometime."

Q. Pay what?

A. The insurance.

She also testified that the defendant brought up the subject of insurance on the children's lives, and that she had never mentioned the subject to him because it was none of her business.

James Michael Meads testified he was one of the firemen who responded to the alarm for the fire at 208 Oak Grove Avenue. He entered the flaming house and rescued Latoyia. He also found Lateyia dead in the living room and described her as "[a] mass of burnt tissue."

Lieutenant James Stanley, an eleven-year veteran with the fire department, also responded to the alarm. He stated that: "[In] my opinion, a flammable liquid was used or was burning at this residence." Specifically, he testified that in his opinion a flammable liquid was burning "[i]n the living room trailing backwards to the kitchen."

Cecil Richardson, Jr. and Floyd Douglas Allen were found by the trial court to be experts on the origin and causes of the fire. Both witnesses corroborated Stanley's testimony regarding the presence of a flammable liquid. Allen testified that in his opinion two and one-half to five gallons of a flammable liquid were poured onto the floor at the time of the fire. Richardson examined the kerosene heater located in the bedroom shared by Ruth Cowell and the defendant. He testified that it showed no signs of having been used and contained no fuel. Allen testified that the kerosene heater in the bedroom was not associated with the fire's origin.

The defendant testified in his own behalf and offered several character witnesses. He testified that on the night of the fire he refueled the kerosene heater in the bedroom and the woodburning heater in the living room and started fires in both. He then went to get some water. When he returned and opened the bedroom door, fire rushed out at him. The defendant testified that he did not pour kerosene on the floor nor did he set fire to the house or have any intention to harm the children or Ruth. He said that he considered Ruth and her children his family and would not hurt them.

[1]  By his first assignment of error, the defendant contends that the trial court committed prejudicial error by allowing Michele Cowell and Don Davis to respond to leading questions asked by the prosecutor. "A leading question is generally defined as one which suggests the desired response and may frequently be answered yes or no." *State v. Britt*, 291 N.C. 528, 539, 231 S.E. 2d 644, 652 (1977). The general rule is that leading questions should be asked only on cross-examination. N.C.G.S. § 8C-1, Rule 611(c) (Cum. Supp. 1985). However, a trial judge must "exercise reasonable control over the mode . . . of interrogating witnesses . . . ." N.C.G.S. § 8C-1, Rule 611(a) (Cum. Supp. 1985). Leading questions should be permitted on direct examination when necessary to develop the witness's testimony. N.C.G.S. § 8C-1, Rule 611(c)

(Cum. Supp. 1985). Among other things, this means that it is within the discretionary power of the trial judge to allow leading questions on direct examination. Counsel may be allowed to lead a witness on direct examination when the witness has difficulty in understanding the question because of immaturity or advanced age. *See State v. Greene,* 285 N.C. 482, 492, 206 S.E. 2d 229, 236 (1974). Rulings by the trial judge on the use of leading questions are discretionary and reversible only for an abuse of discretion. *See State v. Smith,* 290 N.C. 148, 160, 226 S.E. 2d 10, 18, *cert. denied,* 429 U.S. 932, 50 L.Ed. 2d 301 (1976).

We assume *arguendo* that all of the questions directed to these two witnesses and assigned as error were leading. Michele Cowell was eleven years old and Don Davis was fifteen years old at the time of trial. Both had trouble in understanding certain questions asked of them. A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision. *State v. Hayes,* 314 N.C. 460, 334 S.E. 2d 741 (1985); *White v. White,* 312 N.C. 770, 777, 324 S.E. 2d 829, 833 (1985). We find no such abuse of discretion by the trial court in allowing the questions to be asked and answered.

[2] By his next assignment the defendant contends that the trial court erred by overruling his objection to a question asked Michele Cowell regarding statements allegedly made by the defendant. Michele's testimony was that she heard the defendant say: "That was a lot of money riding on this fire." and "I messed up." The defendant argues that the prosecutor did not establish a proper foundation for the question because he did not show the proximity of the witness to the defendant and, thus, there was no evidence that the witness could hear the defendant.

The North Carolina Rules of Evidence state that: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." N.C.G.S. § 8C-1, Rule 602 (Cum. Supp. 1985). Michele's testimony that she in fact heard the defendant make the statements in question *ipso facto* amounted to testimony that she had the ability to hear him make those statements. No more was required to establish her personal

knowledge under Rule 602, but the defendant was, of course, free to cross-examine her as to such matters. In the present case, however, Michele's testimony also established that she was near the defendant when she heard him make the statements. The testimony of Michele was sufficient to show her ability to perceive and hear the defendant's statements and thus, to support a finding that she had personal knowledge of the matters in question. This assignment of error is meritless.

[3] By his next assignment of error the defendant contends that the trial court erred by overruling his objections to questions asked of Michele Cowell and Don Davis as to what they could smell while in the house. The defendant argues that these questions assumed facts not yet in evidence because they assumed there was something present to be smelled, i.e., a flammable liquid.

Assuming *arguendo* that the trial court erred by overruling the defendant's objections to such questions, we perceive no resulting prejudice to the defendant. The record is replete with evidence that kerosene was in the home at all times in question and had been used by the defendant to start the fire in the wood heater. Therefore, there would have been nothing remarkable about an odor of kerosene in the house. For these reasons there was no reasonable possibility that a different result would have been reached at trial had the errors in question not been committed. The defendant has shown no prejudice resulting from such errors. *See* N.C.G.S. § 15A-1443 (1983).

[4] The defendant next assigns as error the admission of testimony tending to show that he physically mistreated Ruth Cowell when she returned home after spending time elsewhere. This assignment is without merit. The North Carolina Rules of Evidence provide that: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (Cum. Supp. 1985). Generally, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (Cum. Supp. 1985). We conclude that the evidence complained of was admissible as it tended to show the defendant's motives and state of mind at the time the crimes occurred. N.C.G.S. § 8C-1, Rule 404(b) (Cum. Supp. 1985).

Although motive is not an element of any of the crimes for which the defendant stands convicted, his motives and state of mind at the time of the fire certainly were facts "of consequence to the determination of the action. . . ." N.C.G.S. § 8C-1, Rule 401 (Cum. Supp. 1985). The trial court did not err by admitting such evidence.

[5] The defendant also assigns as error the trial court's ruling allowing Lieutenant James Stanley, an eleven-year veteran of the Elizabeth City Fire Department, to opine that a flammable liquid was burning on the living room floor and "trailing" towards the kitchen. The defendant argues that Stanley was never qualified as an expert witness, and that opinions such as the one given here may not be introduced through lay witnesses.

Justice Copeland, writing for this Court in *State v. Hunt*, 305 N.C. 238, 243, 287 S.E. 2d 818, 821 (1982), said:

> An objection to a witness's qualifications as an expert in a given field or upon a particular subject is waived if it is not made in apt time upon this special ground, and a mere general objection to the content of the witness's testimony will not ordinarily suffice to preserve the matter for subsequent review.

The defendant merely made a general objection to the testimony which is the subject of this assignment. Therefore, any objection to the witness testifying as an expert was waived, and the assignment is overruled.

The defendant's contention that Stanley's testimony invaded the province of the jury because his opinion embraced an ultimate issue of fact is also without merit. That Stanley's opinion testimony as an expert embraced an ultimate issue to be decided by the trier of fact did not make it objectionable. N.C.G.S. § 8C-1, Rule 704 (Cum. Supp. 1985).

By his next assignment the defendant contends that the trial court erred by denying his motion to dismiss all charges at the close of all of the evidence. The defendant argues that the evidence was insufficient to permit the submission to the jury of the charges against him. This assignment is without merit.

At the close of the State's evidence and at the close of all evidence, the defendant moved to dismiss the charges against him

for first degree murder, first degree arson and felonious assault with a deadly weapon—fire—with intent to kill and inflicting serious injuries. When a defendant moves under N.C.G.S. § 15A-1227(a)(2) for dismissal at the close of all the evidence, "the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense. If so, the motion to dismiss is properly denied." *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E. 2d 649, 651-52 (1982). The trial court is to view all of the evidence in the light most favorable to the State and give it all reasonable inferences that may be drawn from the evidence supporting the charges against the defendant. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). "The trial court is *not* required to determine that the evidence excludes every reasonable hypothesis of innocence prior to denying a defendant's motion to dismiss." *Id.* at 101, 261 S.E. 2d 118. The trial court must determine as a matter of law whether the State has offered "substantial evidence of all elements of the offense charged so any rational trier of fact *could find* beyond a reasonable doubt that the defendant committed the offense." *State v. Thompson*, 306 N.C. 526, 532, 294 S.E. 2d 314, 318 (1982) (emphasis added).

[6] The defendant was charged among other things with assault with a deadly weapon with the intent to kill inflicting serious injury. He was convicted of the lesser included offense of assault with a deadly weapon inflicting serious injury. The defendant contends that the trial court erred in submitting either the original charge or the lesser included offense to the jury. Citing *State v. Palmer*, 293 N.C. 633, 239 S.E. 2d 406 (1967), he argues that a "deadly weapon" is an "instrument" which is likely to produce death or great bodily harm under the circumstances of its use. The defendant argues that fire is not an "instrument" and, therefore, cannot in and of itself ever be a deadly weapon within the meaning of the law. We do not agree.

Justice Parker, later Chief Justice, writing for this Court in *State v. Cauley*, 244 N.C. 701, 707, 94 S.E. 2d 915, 920 (1956) stated:

A deadly weapon is not one that must kill. It is an instrument which is likely to produce death or great bodily harm, under the circumstances of its use. Some weapons are *per se*

deadly, *e.g.*, a rifle or pistol: others, owing to the great and furious violence and manner of use, become deadly. 'The deadly character of the weapon depends sometimes more upon the manner of its use and the condition of the person assaulted than upon the intrinsic character of the weapon itself.' Where the deadly character of the weapon is to be determined by the facts and circumstances, the relative size and condition of the parties and the manner in which it is used, it becomes a question for the jury under proper instructions from the court.

(Citations omitted.)

It is unnecessary for this Court to decide in the context of this case whether fire is a deadly weapon *per se*. *Cauley* clearly suggests that, at the very least, fire can be a deadly weapon according to its manner of use. *See State v. Price*, 265 N.C. 703, 144 S.E. 2d 865 (1965). In the present case, the State's evidence tended to show that the victim of the assault, Lateyia Cowell, was five years old and asleep at the time the defendant set fire to the house. This evidence was sufficient to justify the trial court in permitting the jury to find that the fire in the present case was used as a deadly weapon. The defendant's argument to the contrary is without merit.

[7] The defendant next argues that there was no eyewitness testimony tending to show that he set the fire in the home or did any other criminal act. He also points out that he made no specific admission of wrongdoing to anyone and that there has been no showing that he in fact gained financially due to the fire and resulting death and injuries. The defendant therefore contends that all of the charges against him should have been dismissed. We do not agree.

When considered in the light most favorable to the State, as it must be for purposes of considering the defendant's motion to dismiss, the evidence tends to show that the defendant thought that Ruth Cowell had been staying with other men at times when she absented herself from him. He had beaten her on more than one occasion — most recently a day or two before the fire — for this reason. He had also treated her children by other men in a "mean" fashion. For example, he once forced a hot dog down five-year-old Lateyia's throat because she ate slowly. He often made

her stand on one leg on a chair and beat her if she put the other leg down.

On the night of the fire in question, the defendant bought kerosene in a five gallon can and took it home with him. The evidence tended to show that, excluding the defendant, all occupants of the home went to sleep. Sometime thereafter the occupants who survived were awakened by a large fire which was burning in the living room and "trailing backwards" to the kitchen. The defendant's own evidence viewed in the light most favorable to the State, tended to show that he was the only person awake in the house at the time the fire broke out. Although the defendant testified that he did not pour any kerosene on the floor, expert testimony was introduced tending to show that the "pour pattern" established that from two and one-half to five gallons of flammable liquid had burned on the living room and kitchen floors. All evidence tended to show that the defendant was the only person in the house to use a flammable liquid on the night of the fire. Although the defendant consistently stated at trial that Ruth Cowell and her children were like his children and he considered them his children, the defendant was smiling when he stated a short time after the fire: "That was a lot of money riding on this fire." and "I messed up."

The foregoing evidence was sufficient to permit but not compel a rational trier of fact to find among other things that the defendant intentionally and maliciously lit a fire in and burned the Cowell dwelling house with the intent to kill the entire family, and that his actions actually caused death and other serious bodily injury within. Therefore, the trial court did not err in denying the defendant's motion to dismiss the charges against him. This assignment of error is without merit and is overruled.

The defendant received a fair trial free from prejudicial error.

No error.