STATE OF NORTH CAROLINA v. HOWARD BEAVER

No. 710A85

(Filed 12 August 1986)

**Narcotics § 4.3— marijuana growing in field—constructive possession—evidence
sufficient**

There was substantial evidence that defendant was in constructive posses-
sion of marijuana growing in a field behind his house where, when viewed as a
whole and in the light most favorable to the State, the State's evidence tended
to show that defendant specifically told officers that he had known marijuana
plants were growing behind his residence; defendant had been coming around
the house from the general direction of a barn and the marijuana fields when
he was first seen by the officers; defendant was wearing work clothes and
sweating heavily; the marijuana patches had been intensively cultivated and
watered on a regular basis; after defendant was arrested, he clearly demon-
strated his intimate knowledge of the terrain where the marijuana patches and
barn were located by telling officers the best way to go to the house, warning
them in detail of specific obstacles such as ditches and groundhog holes; when
officers brought defendant back to the house his mother said to him that she
had told him he'd get caught and not to mess with that stuff, to which defend-
ant replied that he had not been caught in the fields or doing anything; paths
had been cut through high dense weeds with power machinery from defend-
ant's yard to a barn where marijuana was drying; and, although there was evi-
dence that the marijuana patches could have been reached by a logging road,
the road was passable only on foot or by four-wheel drive vehicle and did not
lead directly to the marijuana patches. N.C.G.S. § 8C-1, Rule 803(2) (Cum.
Supp. 1985).

APPEAL by the State under N.C.G.S. § 7A-30(2) from the deci-
sion of a divided panel of the Court of Appeals, 77 N.C. App. 734,
336 S.E. 2d 112 (1985), reversing a judgment entered by *Downs*,
*J.*, on 20 July 1984 in Superior Court, CHEROKEE County. Heard
in the Supreme Court on 15 April 1986.

*Lacy H. Thornburg, Attorney General, by Lucien Capone, III,
Assistant Attorney General, for the State.*

*Jones, Key, Melvin & Patton, P.A., by R. S. Jones, Jr. and
Chester Marvin Jones, for the defendant appellee.*

MITCHELL, Justice.

The defendant was convicted of manufacturing a controlled
substance (marijuana) upon a proper indictment and was sen-
tenced to imprisonment for a term of three years. Three related

charges were dismissed at the close of the State's evidence. The defendant appealed to the Court of Appeals.

The majority of the panel in the Court of Appeals concluded that the evidence was insufficient to support a finding of constructive possession of the marijuana by the defendant. As a result, the Court of Appeals reversed the defendant's conviction. Hedrick, C. J., dissented. We reverse the decision of the Court of Appeals.

The State's evidence, viewed in the light most favorable to the State, tended to show *inter alia* that on 28 July 1982, the State Bureau of Investigation and the Cherokee County Sheriff's Department were jointly involved in a marijuana eradication program. Special Agent Rick Whisenhunt of the State Bureau of Investigation testified that in July 1982 he was responsible for drug enforcement activities in several North Carolina counties. On 28 July 1982, he was conducting an aerial surveillance and ground operation in a search for marijuana in Cherokee County. A nine-person ground crew followed the directions of an aircraft pilot and went to the Beaver residence in the Violet Community.

The defendant Howard Beaver first was seen coming from behind the house. He was wearing a pair of green coveralls and a headband and "sweating heavily." Special Agent Thomas Frye told the defendant that marijuana plants had been seen from the air growing behind the residence and asked for permission to go through the yard to secure the plants. The defendant stated that his mother would not appreciate their driving through the yard. He directed the officers to use a logging road located to the right of the residence. The defendant stated that he and his mother lived in the house.

The officers then followed the logging road and found a barn approximately seventy-five yards from the house. The barn contained drying marijuana plants. The marijuana was "still on the stalk hung upside down like tobacco in a barn." The area around the barn "was all grown up but the worst areas were bush-hogged."[1] A path which appeared to have been cut and mowed

---

1. We are not certain that the term "bushog," "bushhog" or "bush hog" is universally recognized. This descriptive term is used in North Carolina, at least, when referring to a particular type of rather heavy machinery used for removing bushes, small trees and heavy underbrush.

with a "bushhog" and tractor ran directly from the yard of the Beaver residence to the barn. Other paths had been "bushhogged" and mowed from the house directly to patches of marijuana growing behind the house.

The officers located a total of five marijuana patches growing at distances of from three hundred yards to five hundred yards behind the house. The plants appeared to have been well fertilized and watered and were from eight to twelve feet high. Fertilizer bags and water jugs were found in the mouth of a nearby stream.

Whisenhunt testified that he did not see any other roads leading from the state road in front of the Beaver residence to the marijuana patches. The logging road was passable only by vehicles with four-wheel drive. He stated that the road was "red clay and washed really badly" and "overgrown on either side."

While the officers were in the fields of growing marijuana, the defendant was seen standing nearby. He had removed his coveralls and was wearing trousers and a shirt. The defendant was placed under arrest shortly thereafter. As the officers prepared to take the defendant back to his residence in one of their vehicles, the defendant stated that they could not drive directly to the house. He then gave directions to the officers as to the best route back to the house and told them the location of groundhog holes and other obstacles they should avoid on the way.

The defendant's mother was at the house when the officers brought him there from the marijuana patch. She began to cry when she was told that her son had been arrested for manufacturing marijuana. Agent Frye testified that the defendant's mother then told the defendant: "I told you you'd get caught. I told you not to mess with that stuff." The defendant responded: "Shut up Mama, shut up Mama. They hadn't caught me in the fields, they hadn't caught me doing anything. Shut up."

While being transported to jail the defendant said that he had known the marijuana plants were being grown behind his residence, but that he was not going to tell anyone because "it ought to be legal anyhow." He further said that he was on parole from prison in Kansas and could not tell anyone about the marijuana because a condition of his parole was that he not act as an inform-

ant. The defendant asked Whisenhunt how many pounds of marijuana he estimated would be taken. Whisenhunt said at least three hundred pounds. The defendant then said: "Well, there won't be that much after it dries. I have seen it drying in barns before and it really loses its weight."

C. D. Holbrook, Special Agent and the Chief Pilot for the State Bureau of Investigation, also testified. On 28 July 1982, he was piloting an aircraft and making an aerial search for growing marijuana in Cherokee County. He spotted what appeared to be marijuana growing behind the defendant's home and directed the ground crews to go there. Holbrook testified that from the air he saw "very clearly defined paths that went from the house area back in the direction of the patches." He informed the officers in the ground crews to go to the rear of the house where they would find paths leading to the patches.

Cherokee County Deputy Sheriff Clay Hardin testified that he accompanied other deputies and agents of the State Bureau of Investigation to the Beaver residence on 28 July 1982. The only indication of any recent cultivation in the vegetable garden behind the Beaver home was found at one spot where it appeared that someone had been digging potatoes in "just a small area there, big enough for a meal." However, "The tater digging was about a day or two old." Grass had already started growing in that spot.

Hardin also testified that there were paths leading to the marijuana patches and that there was a trail four to five feet from the side of the barn to the edge of the yard. In addition: "The barn was growed up except for one area right when you go in the barn that had just been . . . bushhogged apart and go into the barn." Ragweeds, milkweeds, and itch weeds were growing higher than Hardin's head in the area between the barn and a tool shed at the edge of the yard of the Beaver home. A patch had been "bushhogged" through the weeds and was "wide enough for any man could walk with ease through there without getting soaking wet." A person standing at the shed could see a person standing at the side of the barn and carry on a conversation with him "without straining your voice."

The State contends that the Court of Appeals erred by reversing the judgment of the trial court. The State argues that the

evidence at trial was sufficient to require submission of the charge of manufacturing marijuana to the jury and to support the verdict and judgment against the defendant. We agree.

The test to be applied in considering a defendant's motion to dismiss for insufficiency of the State's evidence in a criminal case has been stated frequently by this Court in recent years.

> When a defendant moves under N.C.G.S. § 15A-1227(a)(2) for dismissal at the close of all the evidence, 'the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense. If so, the motion to dismiss is properly denied.' The trial court is to view all of the evidence in the light most favorable to the State and give it all reasonable inferences that may be drawn from the evidence supporting the charges against the defendant. 'The trial court is *not* required to determine that the evidence excludes every reasonable hypothesis of innocence prior to denying defendant's motion to dismiss.' The trial court must determine as a matter of law whether the State has offered 'substantial evidence of all elements of the offense charged so any rational trier of fact *could find* beyond a reasonable doubt that the defendant committed the offense.' (Emphasis added.)

*State v. Riddick*, 315 N.C. 749, 759, 340 S.E. 2d 55, 61 (1986) (citations omitted). We also have emphasized that:

> *Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'* The terms 'more than a scintilla of evidence' and 'substantial evidence' are in reality the same and simply mean that the evidence must be existing and real, not just seeming or imaginary. If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion to dismiss should be allowed. This is true even though the suspicion so aroused by the evidence is strong.
>
> . . . .
>
> [T]he trial court should only be concerned that the evidence is sufficient to get the case to the jury; it should not be concerned with the weight of the evidence.

. . . .

The court is to consider all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State. The defendant's evidence, unless favorable to the State, is not to be taken into consideration. However, when not in conflict with the State's evidence, it may be used to explain or clarify the evidence offered by the State. In ruling on the motion, evidence favorable to the State is to be considered *as a whole* in determining its sufficiency.

*The test of the sufficiency of the evidence . . . is the same whether the evidence is direct, circumstantial or both.*

*State v. Earnhardt*, 307 N.C. 62, 66-68, 296 S.E. 2d 649, 652-53 (1982) (emphasis added) (citations omitted).

As the Court of Appeals said in its opinion in this case: "It is not disputed that marijuana was in fact being manufactured. The dispositive question in this case is whether substantial evidence was adduced that the defendant was the manufacturer, which question may only be answered by determining whether the defendant was in actual or constructive possession of the marijuana." 77 N.C. App. at 737, 336 S.E. 2d at 114. The State does not contend that the defendant had actual possession of the marijuana. Instead, the State argues that substantial evidence was introduced at trial which would support a rational finding that the defendant had constructive possession of the marijuana in question.

A person is in constructive possession of a thing when, while not having actual possession, he has the intent and capability to maintain control and dominion over that thing. *State v. Williams*, 307 N.C. 452, 455, 298 S.E. 2d 372, 374 (1983). As with other questions of intent, proof of constructive possession usually involves proof by circumstantial evidence. However, in testing the sufficiency of the evidence, the test to be used "is the same whether the evidence is direct, circumstantial or both." *State v. Earnhardt*, 307 N.C. at 68, 296 S.E. 2d at 653. "In ruling on the motion, evidence favorable to the State is to be considered *as a whole* in determining its sufficiency." *State v. Powell*, 299 N.C. 95, 99, 261 S.E. 2d 114, 117 (1980) (emphasis added).

In reaching its holding, the Court of Appeals seems to have treated this as a case in which the State was required to rely entirely or almost entirely upon the mere proximity of the marijuana patches and barn to the defendant's residence. After discussing in detail the distance from the defendant's residence to the places where marijuana was found, the Court of Appeals emphasized evidence tending to show that the marijuana patches and barn were on property not owned by the defendant. Additionally, in reaching its holding, the Court of Appeals relied upon cases such as *State v. Payne*, 73 N.C. App. 154, 325 S.E. 2d 654 (1985) and *State v. Wiggins*, 33 N.C. App. 291, 235 S.E. 2d 265, *cert. denied*, 293 N.C. 592, 241 S.E. 2d 513 (1977). In those cases the State was forced to rely entirely or almost entirely upon mere proximity of growing marijuana to the defendant's residence in order to carry its burden. This simply is not such a case.

We conclude that when all of the evidence favorable to the State is viewed as it must be viewed, *as a whole* and in the *light most favorable to the State*, there was substantial evidence that the defendant was in constructive possession of the marijuana seized at the time of his arrest. Therefore, the trial court properly denied the defendant's motion to dismiss. The Court of Appeals erred in reversing the judgment of the trial court.

The State's evidence tended to show that the defendant specifically stated to the officers that he had known that the marijuana plants were growing behind his residence. When the defendant was first seen by the officers, he was coming around the house from the general direction of the barn and marijuana fields. He was wearing coveralls and sweating heavily. From this the jury reasonably could have inferred that he had been working behind the house in the area which included the vegetable garden, barn and marijuana patches. No part of the vegetable garden had been recently cultivated, but the marijuana patches had been intensively cultivated and watered on a regular basis. It would have been reasonable on this evidence, for the jury to find that the defendant had just come from working in the marijuana patches and the barn used for curing marijuana.

After joining the officers in one of the marijuana patches and being arrested there by them, the defendant clearly demonstrated his intimate knowledge of the terrain where the marijuana

patches and barn were located by telling the officers the best way to go to the house. He first described the general topography. He then told them the fastest and easiest way back to the house and warned them in detail of very specific obstacles such as ditches and groundhog holes.

When the officers brought the defendant back to the house in one of the vehicles, his mother told him: "I told you you'd get caught. I told you not to mess with that stuff." The defendant then told her: "Shut up Mama, shut up Mama. They hadn't caught me in the fields. They hadn't caught me doing anything. Shut up."[2] The trial court correctly deemed the accusatory statements by the defendant's mother to be "excited utterances." This case was tried under our new North Carolina Rules of Evidence which define an "excited utterance" as being "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C.G.S. § 8C-1, Rule 803(2) (Cum. Supp. 1985). Hearsay testimony concerning such excited utterances is admissible. *Id.*

The jury was entitled to consider the defendant's mother's excited utterances in the form of accusatory statements and his responses. The jury also could consider his knowledge of marijuana drying processes, his statement that he had known about the marijuana, his intimate familiarity with the terrain around the marijuana patches and barn, and the fact that he had come from the direction of the marijuana patches and barn in work clothes and sweating heavily.

Further, the fact that the path was cut by power machinery from the shed to the barn through approximately fifty-five yards of high dense weeds would support a finding that the defendant cut them or observed them being cut. A reasonable jury also could have found on this evidence that the paths were cut from the shed to the barn for some reason related to the contents of the barn. The only thing occurring in the barn at the time the

---

2. The evidence revealed slightly differing versions of the precise dialogue between the defendant and his mother. The opinion of the Court of Appeals includes what appears to be a composite of the differing versions. For purposes of ruling on a motion to dismiss, of course, the State is entitled to have only the version most favorable to the prosecution considered. *See generally State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). It is that version we quote and rely upon here.

defendant was arrested was the drying of marijuana plants — a process about which the defendant professed and demonstrated familiarity.

The Court of Appeals was impressed with the fact that some evidence tended to show that the marijuana patches could have been "accessed" by the logging road near the home. This is true, although the evidence indicated that reaching the marijuana patches by the road would have been quite difficult. The road was passable only on foot or by four-wheel drive vehicle, and the road did not go directly to the marijuana patches. When the officers were on the road at the point where it passed closest to the marijuana patches, they could not see the marijuana and had to be directed through underbrush to it by the officer in the aircraft. Evidence favorable to the defendant as to access to the patches is not the controlling factor in considering the propriety of the trial court's denial of the defendant's motion to dismiss in this case. The State's evidence *need not* exclude every reasonable hypothesis of innocence before the trial court properly can deny the defendant's motion to dismiss for insufficiency of the evidence. *State v. Riddick*, 315 N.C. at 759, 340 S.E. 2d at 61.

Having viewed the evidence as a whole and in the light most favorable to the State as required upon a motion to dismiss for insufficiency of the evidence, we conclude as a matter of law that there was substantial evidence that the defendant was constructively in possession of the marijuana in question in this case. The Court of Appeals erred in reaching a conclusion to the contrary. The holding of the Court of Appeals reversing the judgment of the Superior Court, Cherokee County, is reversed. This case is remanded to the Court of Appeals for reinstatement of the judgment of the Superior Court, Cherokee County.

Reversed and remanded.