STATE OF NORTH CAROLINA
v.
GARY NEAL HIGHTOWER.
No. COA09-865.
Court of Appeals of North Carolina.
Filed April 6, 2010.
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General David W. Boone, for the State.
Appellate Defender Staples Hughes, by Assistant Appellate Defender Emily H. Davis, for Defendant.
BEASLEY, Judge.
Gary Neal Hightower (Defendant) appeals from judgment entered on his conviction of felony possession of cocaine. For the reasons stated below, we hold there is no error.

BACKGROUND
On 8 June 2006, a team from the Caswell County Sheriff's Office, led by Sergeant Clayton Myers of the vice narcotics unit, executed a warrant to search the residence at 116 Bridge Street in Milton, North Carolina. Sergeant Myers was accompanied by several officers from the Sheriff's department, including vice narcotics Lieutenant Eugene Riddick. When the officers arrived at 116 Bridge Street between three and four o'clock that afternoon, two individuals who had been either on the front porch or in the side yard began to flee on foot. While Sergeant Myers and a patrol deputy detained the two subjects in the yard, Lieutenant Riddick and the other officers made entry through the front door.
Lieutenant Riddick testified that upon entering the residence, he found Defendant and a female sitting on a sofa in the living room. After announcing the presence of the Sheriff's department and their possession of the search warrant, Lieutenant Riddick ordered Defendant and the woman to the ground. As both individuals complied with the demand, the officers "secured" Defendant and the female and found no one else in the house before they began to search the residence. Sergeant Myers testified that after detaining the two individuals outside 116 Bridge Street, he went inside and was told by Lieutenant Riddick that the scene was secured for execution of the search warrant.
Lieutenant Riddick searched the living room where Defendant and the woman were found. He saw what appeared to be crack cocaine under a chair, which was situated within one to two feet from the sofa where Defendant had been sitting. During his search of the living room, Lieutenant Riddick also found a partially smoked marijuana cigarette in an ashtray sitting on a coffee table located in front of the sofa. Lieutenant Riddick asked to whom did the crack cocaine belong, and Defendant responded that it was his. Both Lieutenant Riddick and Sergeant Myers testified that Defendant was taken into custody after he admitted that the crack cocaine was his. Defendant was subsequently escorted to the Sheriff's office to fill out an interview sheet, where he was afforded the opportunity to give a written statement. At this point, Defendant was advised of his Miranda rights for the first time  nearly two hours after making the inculpatory statement to Lieutenant Riddick upon his detection of the crack cocaine.
During the execution of the search warrant, the officers discovered that the residence at 116 Bridge Street consisted of a living room, two bedrooms, a kitchen, and a bathroom. In addition to the two substances Lieutenant Riddick had found in the living room, the officers uncovered several items of evidence that were pertinent to the investigation. In the kitchen, Sergeant Myers found a copper-type scouring pad called a "charboy," known to be used to induce cocaine into the body. Cigar shavings and a razor blade, often used to aid in the ingestion of marijuana into the body, were found with the scouring pad and seized as well. In the kitchen, the officers also found a false Coke can with a hidden compartment to conceal items placed therein, a piece of aluminum foil, and a plastic bag  the latter two items often being used in the packaging of controlled substances for sale. In one of the bedrooms at 116 Bridge Street, officers found, inter alia, digital scales, two boxes of sandwich bags, and a change tray containing marijuana residue, seeds, and pieces of stems. Sergeant Myers uncovered a firearm and compatible ammunition in the top drawer of a dresser located in that bedroom. In the same dresser drawer was a Progress Energy power bill addressed to Defendant for services rendered at 116 Bridge Street. When Defendant was processed following his arrest that day and asked for his identification information, he gave his address as 116 Bridge Street, Milton, North Carolina. The second bedroom of the house contained children's clothes and toys, and no items were seized therefrom.
The item suspected to be crack cocaine in the living room, which was collected by Sergeant Myers, was sent to the State Bureau of Investigation for examination. The laboratory analysis concluded that the off-white hard material submitted was a cocaine base Schedule II controlled substance, weighing 0.5 grams.
On 10 June 2008, four bills of indictment were returned against Defendant in Caswell County, charging him with felonious possession of a firearm by a convicted felon, felony possession of cocaine, misdemeanor possession of marijuana, and misdemeanor possession of drug paraphernalia. All four charges were joined for a single trial. Prior to trial, Defendant was given notice that the State intended to introduce at trial evidence of a statement made by Defendant. The case was tried before a jury at the 23 February 2009 Criminal Session of Caswell County Superior Court. During the trial, Defendant neither objected to nor moved to exclude evidence of the inculpatory statement he made to Lieutenant Riddick on 8 June 2006 during the search of 116 Bridge Street. On 24 February 2009, the jury returned verdicts of guilty on all charges against Defendant, and a consolidated sentence of fifteen to eighteen months imprisonment was imposed. Defendant gave oral notice of appeal in open court following the entry of judgment.
Defendant's sole argument on appeal is that the trial court committed plain error by allowing Lieutenant Riddick to testify regarding Defendant's admission of ownership of the crack cocaine made after he was in custody. Specifically, Defendant argues that his inculpatory statement was the product of custodial interrogation, where he was not advised pursuant to Miranda until several hours after questioning, and that the admission of such evidence constituted plain error. We disagree.
Preliminarily, we note that Defendant neither raised an objection to the admission into evidence of Lieutenant Riddick's testimony nor moved to suppress his inculpatory statement, thus precluding the trial court from considering or ruling on the issue. See In re W.R., 363 N.C. 244, 247, 675 S.E.2d 342, 344 (2009) (citing N.C. R. App. P. 10(b)(1)). Therefore, Defendant failed to preserve the question for appellate review. See N.C. R. App. P. 10(b)(1). However, "[i]n criminal cases, an issue that was not preserved by objection noted at trial . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4). The plain error doctrine allows us to address "errors or defects affecting a fundamental right . . . even though they were not previously brought to the attention of the court." In re W.R., 363 N.C. at 247, 675 S.E.2d at 344. In the instant case, Defendant assigned the admission of his inculpatory statement as plain error and argued plain error in his brief on appeal. Accordingly, our review is limited to whether the trial court committed plain error. See State v. Ridgeway, 137 N.C. App. 144, 147, 526 S.E.2d 682, 685 (2000) ("Where, as here, a criminal defendant fails to object to the admission of certain evidence, the plain error analysis . . . is the applicable standard of review."); see also State v. Black, 308 N.C. 736, 741, 303 S.E.2d 804, 807 (1983) (adopting the plain error rule for evidentiary issues).

STANDARD OF REVIEW
"Under the plain error standard of review, defendant has the burden of showing: `(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial.'" State v. Jones, 358 N.C. 330, 346, 595 S.E.2d 124, 135 (2004) (quoting State v. Bishop, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997)). As stated by our Supreme Court:
[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused[.]"
State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting United States v. McCaskill, 676 F.2d 995, 1002 (4th Cir. 1982)). Still, "[a] reversal for plain error is only appropriate in the most exceptional cases." State v. Duke, 360 N.C. 110, 138, 623 S.E.2d 11, 29 (2005). For, in order to conclude that the trial court's error amounted to plain error, this Court must first "`be convinced that absent the error the jury probably would have reached a different verdict.'" State v. Raines, 362 N.C. 1, 16, 653 S.E.2d 126, 136 (2007) (quoting State v. Walker, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986)).
Accordingly, Defendant is not entitled to a reversal of his conviction of felony possession of cocaine unless the admission of his inculpatory statement into evidence caused the jury to return a guilty verdict. See id. ("In other words, the appellate court must determine that the error in question `tilted the scales' and caused the jury to reach its verdict convicting the defendant."). However, before addressing the question of plain error, we must determine whether the trial court committed any error. See State v. Fisher, 171 N.C. App. 201, 208, 614 S.E.2d 428, 433 (2005)("A prerequisite to our engaging in a `plain error' analysis is the determination that the [trial court's action] constitutes `error' at all." (internal quotation marks omitted)).

DISCUSSION
Defendant contends that the trial court erred by admitting into evidence Defendant's inculpatory statement regarding ownership of the crack cocaine because he was not advised pursuant to Miranda before responding to Lieutenant Riddick's question. The United States Supreme Court has laid out specific rights which must be communicated to an individual prior to questioning in order to safeguard the Fifth Amendment privilege against self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). It is well-settled, however, that these "Miranda warnings are required only when a defendant is subjected to custodial interrogation." State v. Patterson, 146 N.C. App. 113, 121, 552 S.E.2d 246, 253 (2001) (citing State v. Gaines, 345 N.C. 647, 661, 483 S.E.2d 396, 404 (1997)). The Miranda Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 16 L. Ed. 2d at 706. The "failure to administer Miranda warnings in `custodial situations' creates a presumption of compulsion which would exclude statements of a defendant." State v. Buchanan, 353 N.C. 332, 336-37, 543 S.E.2d 823, 826 (2001) (citing Oregon v. Elstad, 470 U.S. 298, 306-07, 84 L. Ed. 2d 222, 230-31 (1985)). "Therefore, the initial inquiry in determining whether Miranda warnings were required is whether an individual was `in custody.'" Id. at 337, 543 S.E.2d at 826; accord State v. Walker, 167 N.C. App. 110, 123, 605 S.E.2d 647, 657 (2004).
The State first contends that Defendant was not "in custody" at the time he made the inculpatory statement. The determination of whether a suspect was in custody requires this Court to "examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." Gaines, 345 N.C. at 662, 483 S.E.2d at 405 (citing Stansbury v. California, 511 U.S. 318, 128 L. Ed. 2d 293 (1994) (per curiam)). Accordingly, the test for determining the question of custody is "whether, considering all the circumstances, a reasonable person would not have thought that he was free to leave because he had been formally arrested or had had his freedom of movement restrained to the degree associated with a formal arrest." In re W.R., 363 N.C. at 248, 675 S.E.2d at 344 (citing Buchanan, 353 N.C. at 338-40, 543 S.E.2d at 827-28); see also State v. Jones, 153 N.C. App. 358, 365, 570 S.E.2d 128, 134 (2002) ("This is an objective test, based upon a reasonable person standard, and is to be applied on a case-by-case basis considering all the facts and circumstances." (internal quotation marks omitted)).
"Circumstances supporting an objective showing that one is `in custody' might include a police officer standing guard at the door, locked doors or application of handcuffs." Buchanan, 353 N.C. at 339, 543 S.E.2d at 828. Still, no single factor is determinative of whether or not an individual is in custody under Miranda. State v. Garcia, 358 N.C. 382, 397, 597 S.E.2d 724, 737 (2004) (citing State v. Barden, 356 N.C. 316, 338, 572 S.E.2d 108, 124 (2002)). Moreover, where the indicia of formal arrest are absent, the United States Supreme Court has held: "[T]hat police have identified the person interviewed as a suspect and that the interview was designed to produce incriminating responses from the person are not relevant in assessing whether that person was in custody for Miranda purposes." In re W.R., 363 N.C. at 248, 675 S.E.2d at 344 (citing Stansbury, 511 U.S. at 324, 128 L. Ed. 2d at 300).
[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.
Buchanan, 353 N.C. at 337, 543 S.E.2d at 826-27 (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977)).
Here, at the time Defendant made his inculpatory statement, he was not under formal arrest. However, as to whether Defendant's freedom of movement had been restrained to the degree associated with formal arrest when he admitted ownership of the crack cocaine to Lieutenant Riddick, the record is inconclusive. In the instant case, Defendant was questioned in the living room of his own home. The Miranda Court recognized that there is a "critical difference between interrogation at police headquarters and questioning in the home of the defendant." State v. West, 317 N.C. 219, 227, 345 S.E.2d 186, 191 (1986) (noting that an interviewee's physical surroundings can have a favorable psychological influence as when the suspect is in his own home and finding the questioning which took place in the "familiarity and convenience" of the defendant's own living room was not "equivalent to the `compelling atmosphere' of a custodial interrogation"). While it is undisputed that Defendant was interviewed in his own home, he relies on the case of State v. Crudup to support his contention that a custodial situation existed at that time. 157 N.C. App. 657, 659-60, 580 S.E.2d 21, 24 (2003) (holding the defendant was in custody when interrogated outside of his apartment where he was immediately detained and handcuffed as a burglary suspect and questioned while handcuffed as four officers surrounded him). The State argues that Crudup is inapposite to the instant facts. We agree.
In the case sub judice, there is uncontradicted testimony that Lieutenant Riddick ordered Defendant and a female to the ground upon entry into the residence at 116 Bridge Street. The manner in which the subsequent events transpired is less clear. The record is devoid of any evidence suggesting how long the individuals were detained on the ground or if they were restrained in any other way. Lieutenant Riddick testified at trial that Defendant and the woman were "secured" while the officers ensured that there were no additional occupants in the residence. There is no indication, however, as to how they were secured, and no testimony was elicited at all regarding the use of handcuffs. When asked where Defendant was during the execution of the search warrant, Lieutenant Riddick could not remember if he and the other officers "left him sitting in the living room or took him outside." Despite the uncertainty of this testimony, nothing demonstrates that Defendant was still being forced to the ground when asked to whom the crack cocaine belonged or that his freedom of movement had been restrained to the degree of formal arrest at that time. While Defendant points out the fact that a number of officers were present at his residence, there is no evidence that they surrounded Defendant when Lieutenant Riddick questioned him, as in Crudup, or that any other officer was even within an earshot of Defendant's admission. In fact, any evidence of the circumstances as they existed at the time Defendant made the inculpatory statement was limited to the following colloquy between the prosecuting attorney and Lieutenant Riddick:
Q. Did you have any contact with the defendant regarding state's exhibit number one [crack cocaine rock] for identification purposes and state's exhibit number two [marijuana cigarette] for identification purposes?
A. State's exhibit number one I made the comment to the effect, Whose is this? I don't remember the exact conversation, but Mr. Hightowers [sic] said it was his.
Q. And after Mr. Hightower told you that state's exhibit number one for identification purposes was his, what if anything did you do?
A. He was taken into custody.
Although Lieutenant Riddick could not recall the details of Defendant's admission to his question, "Whose is this?," he referred to their exchange as a "conversation." Defense counsel also referred to the same brief exchange as a "conversation" and a "dialogue," further indicating that the coercive elements of a typically more protracted and accusatory custodial interrogation were not present in this case.
Because no motion to suppress Defendant's admission was made and no objection was raised when his inculpatory statement was admitted into evidence, no findings were made as to the custodial or noncustodial nature of the interrogation. Cf. In re W.R., 363 N.C. at 248, 675 S.E.2d at 344. Without any findings and where the record is so limited regarding the issue of custody, we are unable to conclude that the circumstances were sufficient to convert the investigation of 116 Bridge Street pursuant to a search warrant into a custodial interrogation of Defendant. Under these circumstances, the trial court did not err in admitting, without objection, Defendant's statement that the crack cocaine discovered by Lieutenant Riddick belonged to him. See id. at 248-49, 675 S.E.2d at 344-45.
Even assuming arguendo that Defendant's admission was the product of custodial interrogation, we conclude no plain error resulted from the introduction of the inculpatory statement into evidence. The State proceeded on the theory of constructive possession and produced abundant evidence to support the jury's finding of guilt, absent admission of Defendant's statement. See State v. Matias, 354 N.C. 549, 552, 556 S.E.2d 269, 270 (2001) ("`[I]n a prosecution for possession of contraband materials, the prosecution is not required to prove actual physical possession of the materials.' Proof of nonexclusive, constructive possession is sufficient." (alteration in original) (internal citation omitted)). "A defendant constructively possesses contraband when he or she has `the intent and capability to maintain control and dominion over' it." State v. Miller, 363 N.C. 96, 99, 678 S.E.2d 592, 594 (2009) (quoting State v. Beaver, 317 N.C. 643, 648, 346 S.E.2d 476, 480 (1986)). This power or control may be held by defendant "alone or jointly with others." Id.
Where the contraband "is found on premises under the exclusive control of the defendant, this fact alone may support an inference of constructive possession." State v. Autry, 101 N.C. App. 245, 252, 399 S.E.2d 357, 362 (1991). However, "[i]f the defendant's possession over the premises is nonexclusive, constructive possession may not be inferred without other incriminating circumstances." Id. Our appellate courts have held several circumstances to be incriminating as a matter of law, including, inter alia: (1) close proximity of the defendant to the contraband found, Miller, 363 N.C. at 100, 678 S.E.2d at 595; (2) "indicia of the defendant's control over the place where the contraband is found," Id.; and (3) "evidence of drug paraphernalia found in various areas of the house where . . . defendant[] resided," State v. Harrington, 171 N.C. App. 17, 25, 614 S.E.2d 337, 345 (2005).
Here, not only was Defendant present at 116 Bridge Street when the officers from the Sheriff's department arrived, but the crack cocaine was also found within a foot or two from where Defendant was sitting on the living room sofa. Moreover, the Progress Energy bill for services at 116 Bridge Street, found in the dresser drawer of the bedroom where substantial other evidence of drug paraphernalia was discovered, listed Defendant as the addressee. Finally, Defendant's statement during the booking process that he lived at 116 Bridge Street provided further indicia of Defendant's control of the residence and, thus, constructive possession of the contents therein. See State v. Williams, 307 N.C. 452, 456, 298 S.E.2d 372, 375 (1983) (holding constructive possession of the dwelling in which heroin was found "gives rise to an inference of knowledge and possession of the heroin which may be sufficient to sustain a conviction of unlawful possession of heroin").
Defendant argues in his brief that his location in the living room could not establish constructive possession of the crack cocaine found nearby, especially when the woman seated with him was in equal proximity to the contraband. Defendant states that no fingerprints, personal items, or any other incriminating circumstances linked him to the substance. He fails entirely, however, to address the power bill in his name, his statement as to his residence during the booking process, or the impact of either incriminating circumstance proved by the State. Where Defendant has not convinced us of the weight borne by his inculpatory statement, with respect to the other substantial evidence of possession before the jury, he does not meet his burden under our plain error standard of review. Accordingly, we hold that even if Defendant's inculpatory statement was improperly introduced, in light of the substantial evidence as to Defendant's possession of the residence and other incriminating circumstances, it is not probable that the jury would have returned a different verdict had the statement been excluded. Nor has Defendant persuaded us that erroneous admission of his statement would have been so fundamental as to result in a miscarriage of justice or denial of a fair trial. Therefore, reversal of Defendant's conviction of felonious possession of cocaine is not warranted under a plain error analysis.
No Error.
Judges MCGEE and STEELMAN concur.
Report per Rule 30(e).