STATE OF NORTH CAROLINA v. DANIEL COTINO AQUINO

No. COA01-245

(Filed 5 March 2002)

## 1. Confessions and Incriminating Statements— foreign national—statement made before detention—no rights under Vienna Convention

The trial court did not err by denying the motion of a Mexican national to suppress his statement to officers based upon the Vienna Convention (which requires law enforcement authorities to inform detained or arrested foreign nationals that they may have their consulates notified of their status) where any statements received from defendant were obtained prior to detention and prior to his eligibility for any rights under the Convention. Moreover, courts have refused to hold that suppression is a remedy for a violation of the Convention.

## 2. Confessions and Incriminating Statements— Spanish-speaking SBI agent—no independent notes or interpretations

The trial court did not abuse its discretion by allowing a Spanish-speaking SBI agent who had interviewed defendant to testify concerning defendant's statements, even though there were no independent interpretations or notes of the interview. The agent testified to a conversation he had in Spanish with defendant and not as an expert; whether defendant actually understood the agent goes to the weight of the testimony rather than its admissibility.

Appeal by defendant from judgment dated 1 August 2000 by Judge Richard L. Doughton in Wilkes County Superior Court. Heard in the Court of Appeals 22 January 2002.

*Attorney General Roy Cooper, by Assistant Attorney General K.D. Sturgis, for the State.*

*Law Offices of Timothy D. Welborn, by Timothy D. Welborn, for defendant-appellant.*

GREENE, Judge.

Daniel Cotino Aquino (Defendant) appeals a judgment dated 1 August 2000 entered consistent with a jury verdict finding him guilty of involuntary manslaughter and misdemeanor child abuse.

STATE v. AQUINO

[149 N.C. App. 172 (2002)]

On 6 December 1999, Defendant, a Mexican national, was indicted for first-degree murder and felonious child abuse relating to the death of his two-month-old daughter Jasmin Cotino-Benitez (Jasmin). Defendant filed a motion to suppress his statement on 24 April 2000, alleging Defendant was arrested on 24 September 1999 and interrogated on 25 September 1999 without his attorney, or an interpreter, or the benefit of Miranda rights. Defendant also filed a motion to suppress based on violation of the Vienna Convention on Consular Relations (the Vienna Convention).

On 5 June 2000, Defendant filed a motion for change of venue, alleging that the primary newspaper for Wilkes County had published and circulated several newspaper articles surrounding the injury and death of Jasmin. The trial court denied Defendant's motion for a change of venue from Wilkes County.[1]

Defendant also filed an amended motion to suppress on 5 June 2000 and attached an affidavit stating: he was never advised of his Miranda rights; he did not understand what was asked of him as he was nervous, upset, and unable to comprehend the questions presented; he was never allowed to have an interpreter who spoke the same dialect of Spanish to interpret the questions being asked of him, except the one provided by the authorities; he did not knowingly, voluntarily, and willingly make any statement to law-enforcement officers; he was appointed an attorney on 24 September 1999 and questioned on 25 September 1999, without his attorney present; and at all times while being questioned by law-enforcement officers, he did not feel free to leave. In addition, Defendant filed an amended motion to suppress based on an alleged violation of the Vienna Convention.

At the hearing on Defendant's motions to suppress, Special Agent Michael Brown (Brown) of the North Carolina State Bureau of Investigation (the SBI) testified he responded to a telephone call on 19 September 1999 at Defendant's residence relating to the injury of an infant. After interviewing Defendant, Brown contacted Special Agent Robert Ayala (Ayala) of the SBI, who agreed to come to Wilkes County and interview several people, as he often interpreted for the

---

1. Although Defendant assigned error to the trial court's denial of his motion for change of venue, he has failed to show any abuse of discretion by the trial court as he has not established any prejudice among the jurors due to pretrial publicity. *See State v. King*, 326 N.C. 662, 671, 392 S.E.2d 609, 615 (1990) (a defendant claiming abuse of discretion by the trial court in denying a motion for change of venue must "specifically identify prejudice among the jurors selected").

SBI. Ayala interviewed Defendant on 22 and 23 September 1999 and during these interviews, Defendant arrived at the police station in his own vehicle, he was not arrested or placed in custody, and when the interviews were completed, Defendant left on his own. Defendant was allowed to take restroom and lunch breaks and leave the building unescorted during the interviews. Defendant was not placed under arrest until 24 September 1999, and after that date, he was not interviewed again. On cross-examination, Brown testified Defendant was never read his Miranda rights or asked if he wanted an independent interpreter.

Ayala testified he had worked for the SBI for eleven years, and has spoken Spanish all his life, as both his parents are Puerto Rican. Ayala interviewed Defendant on two separate dates, 22 and 23 September 1999. At the time of the interviews, Ayala was not dressed in a uniform and did not display a weapon or a badge. During the interviews with Defendant, Ayala took notes which he later reduced to a report. At no time did Defendant wear any handcuffs or was he restrained in any manner. At some point during the second interview, Ayala told Defendant that at any time he could "go and do whatever he wanted to." After the second interview ended, Defendant left the police station and Ayala had no further interaction with Defendant. Ayala testified that although his notes stated an interview took place on 25 September 1999, he was mistaken and "misspoke"; the second interview actually took place on 23 September 1999.

On cross-examination, Ayala testified that consistent with the SBI policy, he never made an audio or video recording of the interviews. Prior to starting each interview, Ayala thanked Defendant for coming and told Defendant he did not have to talk to Ayala if he did not want. At no time during the interviews did Ayala tell Defendant he could contact an attorney. Ayala testified that he did not believe there were different dialects of Spanish, but maybe different accents and different idioms. Ayala did not ask Defendant if he needed an interpreter, but he did ask Defendant if he understood him, to which Defendant responded he did.

The trial court found that: Defendant came to the police station by his own transportation; the interviews were conducted in an interview room, with an officer wearing street clothing and not displaying a weapon; Defendant was there voluntarily; Defendant was told he did not have to speak with Ayala and could leave if he wanted; during the interviews, Defendant had restroom privileges, cigarette breaks,

and was allowed to visit with his family at a nearby picnic table; and at the conclusion of each interview, Defendant was allowed to leave by his own transportation. The trial court concluded Defendant was not in custody at the time of the interviews and had been free to leave, thus "he suffered no constitutional depravation in and by the manner in which th[e] statement was given or taken. And, based on that conclusion, the [trial c]ourt DENIES the Motion to Suppress." With respect to the motion to suppress based on the Vienna Convention, the trial court restated the above findings of facts and made additional findings that:

> Defendant was not detained or under arrest at the time that he made the aforementioned statements, that the provisions of the Vienna Convention were not activated and the law[-] enforcement officers involved with the taking of these several statements were under no obligation to contact the Mexican Consular or anyone else, since he was not placed into custody and detained until the following day after which no statement was made by him to any law[-]enforcement officer that the State intends to introduce[.]

The trial court denied Defendant's motion to suppress based on the Vienna Convention.

On 24 July 2000, Defendant filed a motion to suppress based on newly discovered information along with several supporting affidavits from Defendant's family members stating they did not understand Ayala during his questioning of them. At the hearing on the motion, Defendant argued Ayala's transcription of Defendant's statement was not reliable. Although Defendant had received Ayala's transcription on 13 December 1999, he did not have it interpreted until approximately seven months after receiving it. Other than the affidavits, Defendant presented no evidence to show he did not understand Ayala. The trial court found that there had been no newly discovered evidence which Defendant "couldn't have known about prior to the determination of the previous motion" and denied Defendant's motion.[2]

---

2. Defendant assigns error to the trial court's denial of his motion to suppress based on newly discovered evidence. We need not address this issue, however, as Defendant has failed to show that the affidavits included additional information that was not available when he made his first motion. See N.C.G.S. § 15A-975(c) (1999); see also State v. Bracey, 303 N.C. 112, 124, 277 S.E.2d 390, 397 (1981) (evidence which merely corroborates evidence already before the trial court does not meet the standard set out in section 15A-975(c)).

The trial court appointed Jose Agee Ayala (the interpreter) to interpret the testimony of Spanish-speaking witnesses at trial. The interpreter testified that although he speaks the Puerto Rican dialect of Spanish, he was also able to understand and interpret the Mexican dialect. According to the interpreter, the two dialects were "[a] little" different.

Prior to Ayala testifying at trial, Defendant objected to Ayala's qualifications as an expert interpreter. The trial court ruled that Ayala was not testifying as an interpreter, but merely testifying to what Defendant stated to him. The trial court did, however, state that Defendant could cross-examine Ayala concerning whether or not Ayala understood Defendant. Ayala testified that conservatively speaking, he had engaged in approximately 250-300 interviews in Spanish, and the majority of the people he had interviewed were from Mexico or other points in Central America. Ayala testified he interviewed Defendant on 22 and 23 September 1999 regarding the circumstances surrounding Jasmin's death. During both interviews, Ayala and Defendant understood each other. At some points, Ayala would stop to review what Defendant had said and Defendant always said that Ayala's interpretation was correct. Defendant "spoke what [Ayala] underst[oo]d to be normal Spanish usage." During the second interview, when asked if he felt responsible for Jasmin's death, Defendant told Ayala that he thought his "tossing her into the car seat and rocking her" caused her injuries.

On cross-examination, Ayala testified that in accordance with the SBI policy, he did not have any recordings of the interviews conducted with Defendant. Other than a summary that was dictated almost a month after the interview, Ayala had nothing else to substantiate the interview he had with Defendant. Ayala testified he was not aware that Defendant or his family could not understand him during their interviews, as he felt he understood what they were saying to him.

At the close of the State's evidence, Defendant made a motion to dismiss the charges against him claiming the State failed to meet the material elements of the crimes charged. The trial court denied Defendant's motion.

Defendant testified that in his interview with Ayala, he repeatedly told Ayala he did not shake Jasmin. Throughout his interview, Ayala would tell Defendant he did not believe him, would tell Defendant he was lying, and would attempt to tell Defendant how he had placed

Jasmin in the car seat and rocked her. Although Defendant denied Ayala's version of the events, Ayala was adamant about what had happened and continued to tell Defendant he was lying. On cross-examination, Defendant testified he never told Ayala he threw Jasmin into the car seat or he rocked her hard. At times, Defendant did not understand Ayala and felt as if Ayala was misinterpreting what he said. Defendant did not renew his motion to dismiss at the close of all the evidence.[3]

The trial court instructed the jury on second-degree murder, involuntary manslaughter as a lesser-included offense, felonious child abuse, and misdemeanor child abuse. The jury found Defendant guilty of misdemeanor child abuse and involuntary manslaughter.

---

The issues are whether: (I) Defendant was detained or in custody for purposes of the Vienna Convention; and (II) Ayala was competent to testify to conversations he had in Spanish with Defendant.

I

[1] Defendant argues his statements should be suppressed as the State "violated the Vienna Convention by not informing [him] that as a foreign national he had the right to speak with a consulate from his home country." We disagree.

Article 36 of the Vienna Convention on Consular Relations requires law-enforcement authorities "to inform detained or arrested foreign nationals that they may have their consulates notified of their status." *United States v. Santos*, 235 F.3d 1105, 1107 (8th Cir. 2000). Article 36 specifically provides if any individual is detained in a foreign state and so requests, the foreign authorities are required to "inform the consular post of" his nation that he is "arrested or committed to prison or to custody pending trial or is detained in any other manner." Vienna Convention on Consular Relations, April 24, 1963, art. 36(1)(b), 21 U.S.T. 77, 100-01. As treaties are contracts between or among independent nations, they generally do not "create rights that are enforceable in the courts," but instead are rights of the sovereign and not the individual. *United States v. Jimenez-Nava*, 243 F.3d 192, 195-96 (5th Cir.), *cert. denied,* —— U.S. ——, 150 L. Ed. 2d 773 (2001).

---

3. Defendant waived his motion to dismiss made at the close of the State's evidence as he presented evidence and then failed to make a motion to dismiss at the close of all the evidence. N.C.R. App. P. 10(b)(3). Thus, we need not address Defendant's argument that the State did not present substantial evidence of each essential element of the charged offenses.

Likewise, the purpose of the Vienna Convention "is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 79 [hereinafter, Preamble]; *see also Jimenez-Nava*, 243 F.3d at 196 (quoting Preamble). Thus, courts reviewing the issue have refused to hold "suppression of evidence is . . . a remedy for an Article 36 violation." *Id.* at 198.

In any event, Defendant was not detained for purposes of Article 36. A person is detained if a reasonable person in the suspect's position would feel there has been a "formal arrest or a restraint on the freedom of movement of the degree associated with a formal arrest." *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (defining custody), *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997); *see also Black's Law Dictionary* 449 (6th ed. 1990) (to detain a person is to "arrest, . . . to delay, to hinder, to hold, or keep in custody"). At the time Defendant was questioned, he was free to go at any time and did in fact leave the interview room to smoke cigarettes, converse with his family, and ultimately leave the police station and return to his home. At no time after Defendant's arrest did law-enforcement authorities interrogate him. Accordingly, any statements received from Defendant were obtained prior to him being detained and prior to him being eligible to any rights under Article 36. Therefore, the trial court did not err in denying Defendant's motion to suppress the statement based on the Vienna Convention.[4]

II

**[2]** Defendant next argues the trial court erred in allowing Ayala to testify "as interpreter and inves[t]igator, when he was the only witness to statements made by . . . Defendant" and there were no independent interpretations or notes of the interview. We disagree.

Generally, "[e]very person is competent to be a witness," N.C.G.S. § 8C-1, Rule 601(a) (1999), except if he is "incapable of expressing himself concerning the matter as to be understood . . . [or] incapable of understanding the duty of a witness to tell the truth," N.C.G.S. § 8C-1, Rule 601(b) (1999). The requirements are that: the witness is able "to understand and relate, under the obligations of an oath, facts which will assist the jury in determining the truth"; and he

---

4. Likewise, Defendant was not entitled to Miranda warnings as there was no restraint on Defendant's freedom of movement during either interview.

has "personal knowledge of the matter to which he testifies." *State v. Redd*, 144 N.C. App. 248, 255, 549 S.E.2d 875, 880 (2001); *see State v. Riddick*, 315 N.C. 749, 756-57, 340 S.E.2d 55, 59-60 (1986) (personal knowledge of a witness is established by testimony he heard the defendant make the statements in question). Whether a witness is qualified to testify is "a matter which rests in the sound discretion of the trial court in light of its observation of the particular witness." *Redd*, 144 N.C. App. at 255, 549 S.E.2d at 880.

In this case, we first note Ayala did not testify as an expert, but testified to a conversation he had in Spanish with Defendant. Ayala testified he understood Defendant and what he was saying, and felt as if Defendant understood him. While Ayala admitted there were different accents and idioms in the Spanish spoken by Puerto Ricans versus the Spanish spoken by Mexicans, for the most part the two are very similar. Moreover, Ayala had conducted approximately 250-300 interviews with Spanish-speaking individuals, the majority of whom were from Mexico and other Central American countries. While there were no notes or tape recordings taken contemporaneously with the interviews, it was only necessary Ayala heard Defendant make the statements and had the ability to understand Defendant in order to prove he had personal knowledge of the interviews. *See Riddick*, 315 N.C. at 756-57, 340 S.E.2d at 59-60. Furthermore, Defendant was allowed to cross-examine Ayala concerning whether he understood Defendant and whether Defendant understood him. We note the interpreter at trial was also from Puerto Rico and testified there were no real differences between the two dialects. Accordingly, the question of whether Defendant actually understood Ayala is for the jury to decide and goes to the weight to be accorded this testimony, not is admissibility. Therefore, we cannot say the trial court abused its discretion in allowing Ayala to testify concerning Defendant's statements during the interviews.

No error.

Judges HUNTER and TYSON concur.