STATE OF NORTH CAROLINA v. FRANKLIN HERRERA

No. COA08-491

(Filed 3 February 2009)

**1. Confessions and Incriminating Statements— invocation of right to counsel—phone call to grandmother from police station—failure to show grandmother acting as agent of police—subsequent written confession**

Officers did not continue to interrrogate defendant after he invoked his right to counsel when they placed a telephone call to defendant's grandmother in Honduras to inform her that defendant was in custody and allowed defendant to speak with his grandmother by speaker phone, and defendant's subsequent written confession resulting from his conversation with his grandmother was not obtained in violation of his Fifth Amendment right to counsel, because: (1) the record was devoid of any evidence tending to show the phone call to defendant's grandmother was made for the purpose of eliciting incriminating statements from defendant or that she was acting as an agent of the police; (2) a suspect in defendant's position would not have felt coerced to incriminate himself by being permitted to speak with his grandmother via speaker phone in the presence of a detective and an interpreter; (3) State questioning or interrogation ceased once defendant invoked his right to counsel; and (4) even if defendant felt pressured into waiving his right to counsel and confessing to police as a result of his conversation with his grandmother, the Fifth Amendment is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion.

---

**2. Confessions and Incriminating Statements— motion to suppress written statements—Vienna Convention on Consular Relations**

The trial court did not err in a first-degree murder case by denying defendant's motion to suppress both his 13 September and 15 September written statements based on an alleged violation of his rights to the Vienna Convention on Consular Relations when defendant was a Honduran citizen and was not advised of his right to contact the Honduran consulate under Article 36 of the Vienna Convention because: (1) the applicability of the Vienna Convention to state court proceedings is often limited since even though states may have an obligation to comply with the provisions of the Vienna Convention, the Supremacy Clause of the United States Constitution does not convert violations of treaty provisions into violations of constitutional rights; (2) treaties are contracts between or among independent nations, and thus generally do not create rights that are enforceable in the courts, but instead are rights of the sovereign and not the individual; and (3) the purpose of the Vienna Convention is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States, and courts have refused to hold suppression of evidence as a remedy for an Article 36 violation.

**3. Discovery— statements disclosed on morning of trial—failure to show abuse of discretion**

The trial court did not abuse its discretion in a first-degree murder case by allowing defendant's roommate and an interpreter to testify at trial as to certain inculpatory statements allegedly made to them by defendant when the State disclosed the testimony on the morning of trial because: (1) the court's findings indicated that it did not believe the State violated the discovery statutes by not providing these statements to defense until the morning of trial since the State obtained one statement on the prior evening and the other statement that morning; and (2) even assuming arguendo that the State did violate the discovery statute provisions, there was no abuse of discretion when defendant did not request a recess or continuance to address this newly disclosed evidence.

**4. Jury— *Allen* instruction—absence of any indication of deadlock or coercion**

The trial court did not coerce a verdict by giving an *Allen* instruction pursuant to N.C.G.S. § 15A-1235(c) at the beginning of the jury's second day of deliberations after the jury had deliberated only three hours on the first day before taking an end-of-day recess where there was no indication that the jury was deadlocked or in any other way open to pressure by the trial court to force a verdict.

Appeal by defendant from judgment entered 19 October 2007 by Judge J. B. Allen, Jr. in Durham County Superior Court. Heard in the Court of Appeals 22 October 2008.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Alexander McC. Peters, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Charlesena Elliott Walker, for defendant-appellant.*

HUNTER, Robert C., Judge.

Franklin Herrera ("defendant") appeals from judgments entered 19 October 2007 pursuant to a jury verdict finding him guilty of first degree murder. Defendant was sentenced to life imprisonment without parole. After careful review, we find no error.

I. Background

The State presented evidence tending to show that on 29 August 2004, Durham police officers were dispatched to the Palm Park Apartments in Durham, North Carolina, where they discovered the body of Chanda Mwicigi ("the victim") on the sidewalk. The victim was wearing no shoes, her pants were around her ankles, and her panties and shirt were covered with blood. She had lacerations covering her entire body, and an impression resembling a shoe that had stepped in blood was imprinted on her face.

Officers observed a trail of blood leading to a stairwell of an apartment building and into apartment E43. The apartment appeared to be vacant. Officers observed blood in the apartment's kitchen, on the refrigerator, and on the west wall.

On 2 September 2004, Durham Police Sergeant Brett Hallan ("Sergeant Hallan") and Detective Deloris West ("Detective West")

STATE v. HERRERA

[195 N.C. App. 181 (2009)]

responded to a call from Jonnie Howard who stated that she had found the victim's purse in a trash can outside a residence which shared a common boundary with another residence located at 401 Moline Street.

Police went to 401 Moline Street and learned that the residents, all of whom were non-English speaking Honduran nationals, had recently moved there from apartment E43. Officers located all of the residents of 401 Moline Street with the exception of defendant who worked in Virginia during the week and returned to Durham on the weekends. The occupants consented to a search of the residence, and police found what appeared to be blood on the couch and Nike tennis shoes with soles similar to prints found at the crime scene. A search of a car located at the residence revealed bloodstains on the driver's side interior door handle, the steering wheel, the driver's seat and backrest, and the emergency brake handle. Swabs of blood taken from the kitchen area of apartment E43 and from the bottom of defendant's shoes matched the DNA profile of the victim. Swabs taken from the kitchen doorknob in apartment E43 matched the DNA profiles of defendant and the victim, and swabs taken from the car's driver's-side door matched the DNA profile of defendant. Latent fingerprints taken from: (1) the interior storm door glass of apartment E43; (2) a beer bottle found in the kitchen in E43; and (3) the car's rearview mirror matched defendant.

In August and September 2004, officers interviewed the residents of 401 Moline Street with the assistance of Spanish-English interpreters, including Manuel Nestor Gonzalez ("Mr. Gonzalez"). Subsequent to this, police obtained a warrant for defendant's arrest and notified Virginia authorities to pick him up. Before the Virginia authorities located defendant, Mr. Gonzalez called defendant's grandmother in Honduras to see if defendant had returned there and to ascertain his whereabouts. He informed her that the police were looking for defendant and asked her to call him if she heard from defendant. Defendant's grandmother expressed concern and asked Mr. Gonzalez to notify her if police found him. On 13 September 2004, Detective West and Mr. Gonzalez traveled to Virginia Beach, Virginia, where defendant had been arrested and was in custody. Gonzalez interpreted for defendant and read him his *Miranda* rights in Spanish. Defendant signed the *Miranda* waiver form and prepared a written statement, which Mr Gonzalez translated. In this statement, defendant admitted to having sex with the victim on the night in question, and after giving several versions of what happened, he eventu-

ally admitted to stabbing the victim. However, he claimed it was in self-defense, stating that she had attacked him with a knife because he was in a gang known as "MS."

On 15 September 2004, defendant was transported back to the Durham Police Department. There, Detective West interviewed him a second time in Sergeant Hallan's office with Mr. Gonzalez again serving as the interpreter. Before any questions were asked, Gonzalez advised defendant of his *Miranda* rights in Spanish. Defendant requested an attorney, and the questioning stopped. Detective West then prepared defendant's booking report in order to bring him before the magistrate and incarcerate him. Mr. Gonzalez told Detective West that when he had spoken to defendant's grandmother in Honduras earlier in September, she had asked him to let her know if defendant was in custody. Prior to leaving for the magistrate's office, Detective West allowed Mr. Gonzalez to place a call on speaker phone to defendant's grandmother to inform her that defendant was in custody and going to jail and offered to let defendant speak with his grandmother. Defendant indicated that he wanted to speak to his grandmother. He and his grandmother conversed in Spanish over speaker phone in Detective West's and Mr. Gonzalez's presence, with Gonzalez translating the conversation for Detective West. During the telephone call, defendant's grandmother asked him " 'Son, did you do this?,' " and he replied affirmatively. Defendant's grandmother told him to tell the truth to the police, and defendant indicated that he would.

Thereafter, defendant informed Gonzalez that he wanted to tell the truth to the police. Gonzalez re-Mirandized defendant in Spanish; defendant waived his rights and gave a written statement, in which he detailed the events of the murder and confessed to stabbing and killing the victim.

At trial, defendant testified on his own behalf. He claimed that on the night of the murder, he was at a convenience store purchasing beer, when two "MS" gang members approached him as he returned to the car he was driving. He stated that the two men noticed his "MS" tattoos, asked if he was a member, and when he replied that he was, the men asked for a ride to the Palm Park Apartments. Defendant further testified that he agreed out of fear, and the two men got in the backseat. Upon arriving at the apartment complex, the two men noticed the victim, called out to her, and she got in the backseat. · Defendant testified that he parked near his old apartment E43 and that one of the men told defendant he should have sex with the vic-

tim first. He testified that he was afraid to refuse and that he brought the victim into E43 because he still had a key. He further testified that after he and the victim had sex, one of the other men attacked her as she was leaving the apartment. Defendant claimed the other two men kicked the victim in the face and continuously stabbed her; he admitted stabbing the victim but said that he did so out of fear of the other two men and that she was already dead when he stabbed her.

Defendant brought a pre-trial motion to suppress his 13 September and 15 September written statements. Defendant argued these statements were obtained in violation of his Fifth Amendment right to counsel and in violation of his rights pursuant to Article 36 of the Vienna Convention on Consular Relations. Following a hearing on 8 October 2008, the trial court denied defendant's motion. Following trial by jury, defendant was convicted of first degree murder and sentenced to life in prison without parole.

Other facts necessary to the understanding of this case are set out in the opinion below.

On appeal, defendant argues the trial court erred by: (1) denying his motion to suppress his 15 September written statement because it was obtained in violation of his Fifth Amendment right to counsel; (2) denying his motion to suppress his 13 September and 15 September written statements because he had not been advised of his rights under Article 36 of the Vienna Convention; (3) declining to exclude certain testimony containing inculpatory statements allegedly made by defendant to (a) one of his roommates, Pedro De Valladares ("Mr. Valladares") and (b) to Mr. Gonzalez, because the State had violated the discovery statutes by not disclosing this testimony until the morning of trial; and (4) coercing a verdict from the jury by giving a premature *Allen* instruction. We find these arguments to be without merit and address each in turn.

## II. Motion to Suppress

### A. Right to Counsel: 15 September Statement

[1] First, defendant argues that the trial court erred by denying his motion to suppress his 15 September 2004 written statement because Detective West and Mr. Gonzalez continued to interrogate him after he had invoked his right to counsel in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378 (1981). Specifically, defendant argues that by permitting him to speak with his grandmother after he

had invoked his right to counsel, Detective West and Mr. Gonzalez interrogated him in violation of *Miranda* as the phone call was reasonably likely to result in him saying something incriminatory. Defendant also claims that Mr. Gonzalez and Detective West utilized his grandmother to try to get him to confess to killing the victim. *See State v. May*, 334 N.C. 609, 611-13, 434 S.E.2d 180, 181-82 (1993) (excluding the defendant's incriminatory statement made to his girlfriend over the telephone because the girlfriend was a state agent who called and questioned the defendant at the behest of the police). He argues this unconstitutional interrogation negated his subsequent written waiver of rights and confession. Because we conclude defendant was not interrogated subsequent to invoking his right to counsel, we find defendant's argument is without merit.

The standard of review for "a trial court's determination on a motion to suppress is that the trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Barden*, 356 N.C. 316, 332, 572 S.E.2d 108, 120-21 (2002) (citation omitted), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). "Furthermore, the trial court's conclusions of law ' "must be legally correct, reflecting a correct application of applicable legal principles to the facts found." ' " *State v. Barnhill*, 166 N.C. App. 228, 230-31, 601 S.E.2d 215, 217 (citations omitted), *appeal dismissed and disc. review denied*, 359 N.C. 191, 607 S.E.2d 646 (2004). "However, because '[t]he determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law,' this question is fully reviewable on appeal." *State v. Fisher*, 158 N.C. App. 133, 142, 580 S.E.2d 405, 413 (2003) (alteration in original; citation omitted), *affirmed per curiam*, 358 N.C. 215, 593 S.E.2d 583 (2004).

"Once an accused invokes his right to counsel during a custodial interrogation, the 'interrogation must cease and cannot be resumed without an attorney being present *"unless the accused himself initiates further communication, exchanges, or conversations with the police." ' " Id.* (citations omitted). "[H]owever, [not] all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 299, 64 L. Ed. 2d 297, 307 (1980). " 'Interrogation[]' . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 64 L. Ed. 2d at 307 (footnote omitted). It is defined as either "express questioning by law enforcement officers," *State v. Golphin*, 352 N.C. 364, 406, 533 S.E.2d 168, 199 (2000),

*cert. denied,* 532 U.S. 931, 149 L. Ed. 2d 305 (2001), or police conduct that constitutes the "functional equivalent" of express questioning, which includes "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301, 64 L. Ed. 2d at 308 (footnotes omitted).

"The focus of the definition is on the suspect's perceptions, rather than on the intent of the [police], because *Miranda* protects suspects from police coercion regardless of the intent of [the] police officers." *Golphin,* 352 N.C. at 406, 533 S.E.2d at 199 (citing *Innis,* 446 U.S. at 301, 64 L. Ed. 2d at 308). However, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that *they should have known were reasonably likely to elicit an incriminating response.*" *Innis,* 446 U.S. at 301-02, 64 L. Ed. 2d at 308 (footnote omitted; emphasis added and emphasis in original).

> Factors that are relevant to the determination of whether police "should have known" their conduct was likely to elicit an incriminating response include: (1) "the intent of the police"; (2) whether the "practice is designed to elicit an incriminating response from the accused"; and (3) "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion . . . ."

*Fisher,* 158 N.C. App. at 142-43, 580 S.E.2d at 413 (quoting *Innis,* 446 U.S. at 302, n.7, 8, 64 L. Ed. 2d at 308, n.7, 8) (alteration in original).

In its order denying defendant's motion to suppress, the trial court made the following findings[1] as to the circumstances surrounding defendant's 15 September written statement:

> 5a) That the Defendant was transported to Durham, North Carolina on September 15, 2004, and was interviewed . . . by Detective West . . . using the certified interpreter Gonzalez.
>
> . . .
>
> 5d) [T]hat during the interview, the Defendant told Investigator West that he "wanted an attorney".

---

1. Some of these "findings of fact" include conclusions of law, which we review *de novo.*

5e) [N]o further questions were asked of the Defendant at that time after he had requested an attorney.

5f) . . . Mr. Gonzalez, the interpreter, had previously spoken with the Defendant's grandmother in Honduras. That the Defendant was to be carried to the Magistrate and locked up. That the Defendant was given an opportunity to speak to his grandmother. The Court specifically finds that the Defendant wanted to speak to his grandmother in Honduras.

5g) [T]hat the grandmother asked the Defendant, "Son, did you do this?" And the Defendant replied, "Yes, I did it." And the grandmother told the Defendant to tell everything.

5h) [T]hat the Defendant voluntarily and knowingly elected to continue with the interview, that is the interview with Detective West and the interpreter, Mr. Gonzalez.

5i) [T]hat before any further questions were asked of the Defendant, that the Defendant was once again advised of his rights to remain silent. He was advised a second time . . . of his Miranda rights, including the right to have a lawyer. The Court finds that the Defendant waived these rights and freely, voluntarily, [and] knowingly gave another statement.

. . .

5k) [T]he Defendant freely, voluntarily, and knowingly made this statement admitting to stabbing and killing the victim in this case.

. . .

7a) [W]hen the Defendant requested an attorney on September 15, 2004, that no further questions were asked until the Defendant indicated that he wanted to continue with the interview and proceed without a lawyer. And that the Defendant was advised . . . of his constitutional rights to remain silent and to have a lawyer, and he waived those rights[.]

7b) In summation, based on all the evidence before the Court at this hearing, the Court finds that the statements made by the Defendant on September 13, 2004 and September 15, 2004 were freely, knowingly, and voluntarily given after being advised of his rights. That there were no promises or threats, and that the statement given to the law enforcement officer should not be suppressed.

The State cites the United States Supreme Court's decision in *Arizona v. Mauro*, 481 U.S. 520, 95 L. Ed. 2d 458 (1987), to argue that defendant's grandmother was not acting as a state agent and that the police did not utilize words or actions that were reasonably likely to elicit an incriminating response. In *Mauro*, the United States Supreme Court considered whether certain tape recorded statements the defendant made to his wife were the product of unconstitutional interrogation. In that case, after the defendant invoked his right to counsel, he never waived it. *Id.* at 527, 95 L. Ed. 2d at 466-67. The defendant's wife, (who police were also questioning), repeatedly requested to speak with the defendant, which police permitted so long as an officer was present and the conversation was tape recorded. *Id.* at 522, 95 L. Ed. 2d at 463. Also, the officers explicitly testified that they knew it was possible the defendant might make an incriminating statement and that the tape recorder was present to record any incriminating statements. *Id.* at 525, 95 L. Ed. 2d at 465.

The Court concluded that the defendant was not subjected to interrogation and that the recording of his conversation with his wife was admissible. *Id.* at 529-30, 95 L. Ed. 2d at 468. In reaching this conclusion, the Court specifically noted the absence of any evidence indicating that the defendant's wife acted as a state agent or that the defendant was subjected to psychological ploys by the police. *Id.* at 527, 95 L. Ed. 2d at 467. Furthermore, viewing the circumstances from the defendant's perspective, the Court stated: "We doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." *Id.* at 528, 95 L. Ed. 2d at 467. Finally, the Court reasoned that even though the officers may have hoped that the defendant might incriminate himself, "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Id.* at 529, 95 L. Ed. 2d at 468.

In the instant case, as in *Mauro*, the record is completely devoid of any evidence tending to show that the phone call to defendant's grandmother was made for the purpose of eliciting incriminating statements from defendant or that she was acting as an agent of the police. Furthermore, as in *Mauro*, we do not believe that a suspect in defendant's position would have felt coerced to incriminate himself by being permitted to speak with his grandmother via speaker phone in Detective West's and Mr. Gonzalez's presence.

Here, Mr. Gonzalez testified that prior to defendant's detention in Virginia, he called defendant's grandmother to try and ascertain his whereabouts, told her the police were looking for defendant, and

asked her to call the police if she heard from him. In addition, he testified that defendant's grandmother expressed concern for defendant's safety and asked Mr. Gonzalez to contact her "to let her know anything that had happened[.]" Mr. Gonzalez also testified that the purpose of the 15 September phone call was to let defendant's grandmother know that he was in police custody and was okay.

Detective West testified that: (1) immediately after defendant invoked his right to counsel, all questioning ceased and she completed a booking report for defendant; (2) subsequent to this and prior to leaving for the magistrate's office, Mr. Gonzalez informed her that defendant's grandmother had asked to be notified when they had defendant in custody; and (3) after being notified of this, she told Mr. Gonzalez he could use the speaker phone to contact defendant's grandmother in Honduras and let her know he was going to jail. She further testified that: (1) the sole purpose of the call was to inform defendant's grandmother that he was in custody and going to jail; (2) in the past, she had allowed "several people that [she had] arrest[ed] . . . to call and let their relatives know they[] [were] going to jail"; and (3) defendant indicated that he wanted to speak with his grandmother.

Mr. Gonzalez testified that when he placed the 15 September call to defendant's grandmother via speaker phone: (1) he merely told her that defendant had been arrested; (2) the grandmother then asked if defendant was okay; and (3) defendant responded " '[y]es, I'm fine Mom, I'm fine.' " Mr. Gonzalez further testified that subsequent to this, he heard the following exchange:

[T]he grandmother asked, she seemed very upset, I guess crying, and she says, "Son, did you did [sic] this?" And he says, "Yes, Mom, I did." And then the [grandmother] said, "Will you tell this man the truth? You tell him everything you did." And he says, "Yes, mom, I did."

By then [defendant] was tears in his eyes, and, clearly, he wanted to talk. He told Grandmom, or Mom, that he had not been mistreated, and he says, "I'm going to tell them everything." And, again, she thanked us for taking care of him. And he gave us a statement.

This evidence supports the trial court's findings that State questioning or interrogation ceased once defendant had invoked his right to counsel. Furthermore, the record contains no evidence indicating

that police utilized defendant's grandmother as an agent to question him or that by permitting defendant to speak with her, the police were engaging in a psychological ploy to obtain a confession. In addition, the evidence supports the finding that defendant chose to speak to his grandmother, and we note that defendant could have elected not to respond to his grandmother's apparent query as to whether or not he committed the crime, especially when he knew that he was on speaker phone and that Mr. Gonzalez was interpreting the conversation for Detective West. Finally, even if defendant felt pressured into waiving his right to counsel and confessing to police as a result of his conversation with his grandmother, this is of no import as the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad*, 470 U.S. 298, 304-05, 84 L. Ed. 2d 222, 229 (1985) (citations omitted).

In sum, after careful review, we hold the police did not interrogate defendant by placing the phone call to his grandmother to inform her that he was going to jail or by allowing defendant to converse with her on speaker phone. Accordingly, the trial court did not err by denying defendant's motion to suppress on this ground.

### B. Vienna Convention: 13 September and 15 September Statements

[2] Defendant also argues that the trial court erred by denying his motion to suppress both his 13 September and 15 September written statements because these statements were obtained in violation of his rights pursuant to the Vienna Convention on Consular Relations ("the Vienna Convention"). Specifically, defendant argues that his conviction must be vacated and that he must be given a new trial since he is a Honduran citizen and was not advised of his right to contact the Honduran consulate pursuant to Article 36 of the Vienna Convention. *See* Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 100-01, 1969 U.S.T. LEXIS 284, 28-29. We disagree.

> Article 36 of the [Vienna] Convention concerns consular officers' access to their nationals detained by authorities in a foreign country. The article provides that "if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner."

*Sanchez-Llamas v. Oregon,* 548 U.S. 331, 338, 165 L. Ed. 2d 557, 571 (2006) (citation and footnote omitted).

> In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests. Article 36(1)(b) further states that "[t]he said authorities shall inform the person concerned [*i.e.,* the detainee] without delay of his rights[.]"

*Id.* at 338-39, 165 L. Ed. 2d 571-72 (alteration in original; citation omitted).

This Court has not previously addressed this issue. However, in *State v. Nguyen,* we noted that "the applicability of the Vienna Convention to state court proceedings is often limited because while 'states may have an obligation . . . to comply with the provisions of the Vienna Convention, the *Supremacy Clause* [of the United States Constitution] does not convert violations of treaty provisions . . . into violations of *constitutional* rights.'" *Nguyen,* 178 N.C. App. 447, 459; 632 S.E.2d 197, 205 (quoting *Murphy v. Netherland,* 116 F.3d 97, 100 (4th Cir. 1997) (emphasis added and emphasis in original; alterations in original)), *appeal dismissed and disc. review denied,* 360 N.C. 653, 637 S.E.2d 189 (2006), *cert. denied,* —— U.S. ——, 167 L. Ed. 2d 339 (2007). Furthermore, this Court has noted that because "treaties are contracts between or among independent nations, they generally do not 'create rights that are enforceable in the courts,' but instead are rights of the sovereign and not the individual." *State v. Aquino,* 149 N.C. App. 172, 177, 560 S.E.2d 552, 556 (2002) (*quoting United States v. Jimenez-Nava,* 243 F.3d 192, 195-96 (5th Cir.), *cert. denied,* 533 U.S. 962, 150 L. Ed. 2d 773 (2001)). Finally, this Court has noted that "the purpose of the Vienna Convention 'is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States'" and that "courts . . . have refused to hold 'suppression of evidence is . . . a remedy for an Article 36 violation.'" *Id.* at 178, 560 S.E.2d at 556 (citations omitted).

While the United States Supreme Court has not explicitly addressed the issue of whether Article 36 of the Vienna Convention implicates individual rights, that Court has concluded that suppression of evidence is not an appropriate remedy. *See Sanchez-Llamas,* 548 U.S. at 337, 165 L. Ed. 2d at 571. Further, we note that defendant fails to cite a single case from a United States jurisdiction which holds that a violation of Article 36 of the Vienna Convention requires

the suppression of evidence. Hence, without deciding whether Article 36 of the Vienna Convention provides a defendant with an individual right, we hold that the trial court did not err by denying defendant's motion to suppress his 13 September and 15 September written statements solely due to the State's failure to inform him of his right to contact the Honduran Consulate.

### III. Discovery Statute: Failure to Exclude Testimony

**[3]** Defendant next assigns error to the trial court's decision to respectively allow Mr. Valladares and Mr. Gonzalez to testify at trial as to certain inculpatory statements allegedly made to them by defendant. Specifically, defendant challenges the trial court allowing Mr. Valladares to testify that defendant admitted to him that he killed the victim and permitting Mr. Gonzalez to testify that defendant requested a gruesome photo of the victim from the crime scene and that defendant told him he cut her thigh to see if she was black on the inside like she was on the outside. Defendant argues that by not disclosing these statements to defendant prior to the morning of trial, the State violated North Carolina's statutory discovery provisions and that the trial court abused its discretion by declining to exclude this evidence pursuant to N.C. Gen. Stat. § 15A-910 (2007). Defendant contends that due to the State's late disclosure he did not have reasonable time to make effective use of these statements at trial, particularly to challenge these two witnesses' respective character for truthfulness. As a result, he contends he is entitled to a new trial. We disagree.

It is undisputed that on the morning of 8 October 2007, the same day as defendant's motion to suppress hearing as well as the beginning of trial, the State provided defendant with the aforementioned statements of Mr. Valladares and Mr. Gonzalez for the first time. During the pretrial motion to suppress hearing regarding defendant's two written statements, defendant asserted that this late disclosure violated North Carolina's discovery statute provisions and expressed his desire that the evidence be suppressed. *See* N.C. Gen. Stat. §§ 15A-902, -903, -907 (2007). The trial judge deferred considering this issue until trial.

A couple of days after trial had begun, when Mr. Valladares and Mr. Gonzalez were called to testify, the trial court excused the jury and conducted a *voir dire* examination regarding this testimonial evidence. Defendant asserted the aforementioned testimonial evidence was inadmissible on a variety of grounds including, *inter alia*, be-

cause the State had violated the statutory discovery provisions. He noted that this evidence was disclosed almost three years after he had filed a motion for discovery and almost a year and a half since he had filed for discovery of all witness statements.

With regard to Mr. Valladares's statement, the State claimed that they lost track of Mr. Valladares following his initial interview on 2 September 2004 and that they were not able to locate him until 7 October 2007. The State told the court that during the 2 September 2004 interview, Mr. Valladares denied knowing anything regarding the crime. The State also told the court that they did not learn that defendant had purportedly told Mr. Valladares that he killed the victim until the evening of 7 October 2007, and that they disclosed this evidence as soon as possible. Mr. Valladares testified that when he was interviewed by police in September 2004, he did tell them that defendant admitted he had killed the victim.

The court found: (1) that when Mr. Valladares was interviewed on 2 September 2004, he denied knowing anything about the matter; (2) that he was unavailable to the State until 7 October 2007; (3) "that the prosecutor, as an Officer of the Court" stated that the State was unable to obtain this information until 7 October and that the statements were provided to defendant at the earliest possible date, which was 8 October.

With regard to Mr. Gonzalez's testimony, defendant argued that given that Mr. Gonzalez worked for the police department as an interpreter/translator when the crime occurred and that Mr. Gonzalez testified that he believed he had told the investigating officers about defendant's alleged statements at a prior time, disclosure of this information on the morning of trial was a clear discovery violation. The State told the court that they did not provide this information to defendant until the morning of trial because they did not learn of it until that time. The court explicitly asked the prosecutor: "[A]s an officer of the Court, are you saying that you did not know anything about these statements . . . until Monday morning, October the 8th?" He responded, "[c]orrect, Your Honor, and upon learning [of] it, I went and typed it up and then I saw [Detective] West and inquired of her about that. It was my impression that was the first [time] that [she] was aware of it as well."

The trial court found that: (1) defendant strenuously argued that the State clearly violated the discovery statutes and that if not, the evidence should still be disallowed under Rule 403; and (2) the pros-

ecutor stated as an officer of the court that he did not know of these statements until the morning of 8 October. The Court further noted that discovery was provided to defense counsel prior to trial and that while there was a motion to have this testimony suppressed, defendant did not bring a motion to continue the trial.

The Court allowed both Mr. Valladares and Mr. Gonzalez to testify to these statements over defense counsel's objection, and the court granted defendant standing objections as to this testimony.

## A. Preservation

At the outset, we note that the State asserts that defendant has failed to preserve this argument for appellate review. Specifically, the State contends that even though defendant objected to the testimony during the *voir dire* examination of each witness, he waived this issue because he did not renew his objections when the testimony was offered before the jury. In support, the State cites *State v. Grooms*, where the Supreme Court of North Carolina held "that a pretrial motion to suppress, a type of motion *in limine*, is not sufficient to preserve for appeal the issue of admissibility of evidence[,]" and that a "defendant waive[s] appellate review of this issue by failing to object during trial to the admission" of the challenged evidence. *Grooms*, 353 N.C. 50, 66, 540 S.E.2d 713, 723 (2000), *cert. denied*, 534 U.S. 838, 151 L. Ed. 2d 54 (2001).

First, we note that even assuming, *arguendo*, that to preserve this issue for appellate review, defendant was required to re-object to Mr. Valladares's and Mr. Gonzalez's testimony in the presence of the jury, defense counsel did so object to Mr. Gonzalez's testimony. While defendant did not object to Mr. Valladares's testimony in front of the jury, as discussed below, we do not believe that under the circumstances here, N.C.R. App. P. 10(b)(1) or North Carolina case law mandate that defendant had to re-object to this testimony in the jury's presence to preserve this issue when the court had already considered and overruled defendant's discovery violation objection during *voir dire*.

Our law is clear that "a trial court's evidentiary ruling on a pretrial motion is *not* sufficient to preserve the issue of admissibility for appeal unless a defendant renews the objection during trial[,]" *State v. Oglesby*, 361 N.C. 550, 554, 648 S.E.2d 819, 821 (2007), and that "[e]ven if [a] trial court allows [a] party a standing objection, [that] party is not relieved of his obligation to make a contemporaneous objection [at trial]." *State v. Mays*, 158 N.C. App. 563, 578, 582 S.E.2d

STATE v. HERRERA

[195 N.C. App. 181 (2009)]

360, 370 (2003) (citation omitted). Here, however, at the 8 October suppression hearing, defendant merely noted his objection to the admission of this testimony on discovery violation grounds, and the trial judge did not consider the issue until trial. In other words, defendant's objection was argued at trial, (albeit outside of the presence of the jury), and not pretrial. Because defendant raised his objections as to the purported discovery statute violation at trial and obtained a ruling and standing objection on this issue, we believe he sufficiently preserved this issue for appellate review.

In reaching this conclusion we note that defendant's discovery violation argument does not implicate the North Carolina Rules of Evidence; rather, his argument appears to assert that the trial court should have found and concluded that a discovery violation occurred and that due to the violation, the trial court should have excluded this testimony pursuant to section 15A-910. Furthermore, we do not believe our conclusion violates N.C.R. App. P. 10(b)(1) which provides:

> In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion.

Nor do we think our conclusion violates the purposes of Appellate Rule 10(b) as stated by the Supreme Court of North Carolina. "Rule 10(b) 'prevent[s] unnecessary new trials caused by errors . . . that the [trial] court could have corrected if brought to its attention at the proper time.'" *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 195, 675 S.E.2d 361, 363 (2008) (alteration in original; citation omitted). "'Rule 10 functions as an important vehicle to insure that errors are not "built into" the record, thereby causing unnecessary appellate review[.]'" *Id.* (citation omitted). Here, the trial court did consider and rule on the alleged discovery violation at trial. Consequently, we hold defendant did not have to re-object on that ground in the presence of the jury to preserve this issue for review.

## B. Discovery and Testimony

Here, the State clearly had a duty to disclose this testimony pursuant to sections 15A-902, -903, and -907, which it did on the morning

of trial. The purpose of discovery procedures is to protect defendants from unfair surprise. *State v. Alston*, 307 N.C. 321, 331, 298 S.E.2d 631, 639 (1983) (citation omitted). Further, as this Court has stated "[l]ast minute or 'day of trial' production to the defendant of discoverable materials the State intends to use at trial is an unfair surprise and may raise . . . statutory violations. We do not condone either nonproduction or a 'sandbag' delivery of relevant discoverable materials and documents by the State." *State v. Castrejon*, 179 N.C. App. 685, 695, 635 S.E.2d 520, 526 (2006) (citation omitted), *appeal dismissed and disc. review denied*, 361 N.C. 222, 642 S.E.2d 709 (2007).

A trial judge's decision to admit evidence in spite of a discovery objection is reviewed for an abuse of discretion, *see State v. Blankenship*, 178 N.C. App. 351, 355-56, 631 S.E.2d 208, 211-12 (2006), and a trial court's ruling will only be reversed "upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Carson*, 320 N.C. 328, 336, 357 S.E.2d 662, 667 (1987). In the event the trial court determines a discovery violation has been committed, section 15A-910 provides:

(a) If at any time during the course of the proceedings the court determines that a party has failed to comply with this Article or with an order issued pursuant to this Article, the court in addition to exercising its contempt power may

(1) Order the party to permit the discovery or inspection, or

(2) Grant a continuance or recess, or

(3) Prohibit the party from introducing evidence not disclosed, or

(3a) Declare a mistrial, or

(3b) Dismiss the charge, with or without prejudice, or

(4) Enter other appropriate orders.

(b) Prior to finding any sanctions appropriate, the court shall consider both the materiality of the subject matter and the totality of the circumstances surrounding an alleged failure to comply with this Article or an order issued pursuant to this Article.

Nevertheless, trial judges have "broad and flexible powers to rectify the events if a party fails to comply with discovery orders . . . [and] exclusion of evidence as a remedy is strictly within the discretion of the trial judge." *State v. Locklear*, 41 N.C. App. 292, 295, 254 S.E.2d

653, 656, *review denied*, 298 N.C. 571, 261 S.E.2d 129 (1979). As such, "exclusion of evidence for . . . reason[s] that [a] party offering it has failed to comply with discovery statutes . . . rests in the discretion of the trial court[, and] exercise of that discretion, absent abuse, is not reviewable on appeal." *State v. Hill*, 294 N.C. 320, 331, 240 S.E.2d 794, 801-02 (1978) (citations omitted).

Here, the court's aforementioned findings appear to indicate that it did not believe that the State had violated the discovery statutes by not providing these statements to the defense until the morning of trial as the State had only obtained Mr. Valladares's statement on the evening of 7 October and Mr. Gonzalez's statement on the morning of 8 October. However, even assuming, *arguendo*, that the State did violate the discovery statute provisions, upon careful review of the record, we conclude the trial court did not abuse its discretion in allowing this testimony especially when defendant did not request a recess or continuance to address this newly disclosed evidence.

## IV. *Allen* Instruction

**[4]** Finally, defendant argues the trial court coerced a verdict of first degree murder from the jury by giving an *Allen* instruction. *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528 (1896); N.C. Gen. Stat. § 15A-1235 (2007). This argument is without merit.

A trial court's decision to give an *Allen* instruction is reviewed for abuse of discretion. *State v. Adams*, 85 N.C. App. 200, 210, 354 S.E.2d 338, 344 (1987) (citing *State v. Williams*, 315 N.C. 310, 326-37, 338 S.E.2d 75, 85 (1986)). We determine whether a trial court abused its discretion by looking at the "totality of the circumstances." *State v. Dexter*, 151 N.C. App. 430, 433, 566 S.E.2d 493, 496, *affirmed per curiam*, 356 N.C. 604, 572 S.E.2d 782 (2002).

> [A] defendant is entitled to a new trial if the circumstances surrounding the jury deliberations "might reasonably be construed by [a] member of the jury unwilling to find the defendant guilty as charged as coercive, suggesting to him that he should surrender his well-founded convictions conscientiously held of his own free will and judgment in deference to the views of the majority and concur in what is really a majority verdict rather than a unanimous verdict."

*Id.* (citation omitted; second alteration in original).

In *Adams*, this Court held that the defendant failed to show the trial court had abused its discretion by giving an *Allen* instruction

even though the jury had deliberated for less than two hours. *Adams*, 85 N.C. App. at 210, 354 S.E.2d at 344. The Court noted that our Supreme Court had held that "where the record provide[s] no indication that the jury [i]s deadlocked in its deliberations or in any other way open to pressure by the trial judge to force a verdict, even a charge that is in part impermissible under G.S. 15A-1235 is not prejudicial error requiring a new trial." *Id.* (citing *State v. Easterling*, 300 N.C. 594, 608-09, 268 S.E.2d 800, 809 (1980)). After noting that the contents of the trial judge's charge were in accordance with section 15A-1235, the Court in *Adams* held that "any error in the court's decision to instruct the jury pursuant to G.S. [15A-]1235(c) in the absence of any indication of deadlock was not prejudicial to [the] defendant." *Id.*

In the instant case, the jury had deliberated for approximately three hours before breaking for an end-of-day recess. The following morning, right before the jury was to resume deliberations, the trial judge gave the following instruction over defense counsel's objection:

Ladies and gentlemen, as I have already instructed you, in order to return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty. It is the law, and I instruct you, that jurors have a duty to consult with one another and to deliberate with a view of reaching an agreement, if it can be done without violence to individual judgment. Each juror must decide the case for himself or herself, but only after impartial consideration of the evidence with his or her fellow jurors.

In the course of deliberation, a juror should not hesitate to reexamine his or her own views, and change his or her opinion if convinced it is erroneous. And no juror should surrender his or her honest conviction as to the weight or the effect of the evidence solely because of the opinion of his or her fellow jurors, or for the mere purpose of returning a verdict.

Here, the jury had deliberated for a longer period of time than in *Adams*. Furthermore, as in *Adams*, the content of the court's instruction was proper under section 15A-1235. In addition, as in *Adams*, the record here provides "no indication that the jury was deadlocked in its deliberations or in any other way open to pressure by the trial judge to force a verdict[.]" *Id.* Accordingly, even assuming, *arguendo*, that the trial court erred in deciding to instruct the jury pursuant to section 15A-1235, given the absence of any indication of deadlock or coercion, we hold any error was not prejudicial to defendant.

V. Conclusion

In sum, after careful review of defendant's arguments, we find no error.

No error.

Judges ELMORE and GEER concur.